# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

Filed: June 4, 2026

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * | | PUBLISHED |
| MARLA HENRY, parent and | * | |
| natural guardian of K.H., a minor, | * | No. 19-1826V |
| | * | |
| Petitioner, | * | Special Master Nora Beth Dorsey |
| | * | |
| v. | * | Entitlement; Pediarix (Diphtheria-Tetanus- |
| | * | Acellular Pertussis ("DTaP"), Hepatitis |
| SECRETARY OF HEALTH | * | ("Hep B"), Inactivated Poliovirus ("IPV")) |
| AND HUMAN SERVICES, | * | Vaccine; Haemophilus Influenzae Type B |
| | * | ("Hib") Vaccine; Pneumococcal Conjugate |
| | * | 13-Valent ("PCV13"), Rotavirus Vaccine; |
| Respondent. | * | Infantile Spasms; Developmental Delay; |
| | * | Lennox-Gastaut Syndrome. |
| * * * * * * * * * * * * * * * | | |

Renee J. Gentry, Vaccine Injury Clinic, George Washington University Law School, Washington, DC, for Petitioner.
Ryan P. Miller, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION[1]

On December 2, 2019, Marla Henry ("Petitioner"), parent and natural guardian of K.H., a minor, filed a petition under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018).[2]  Petitioner alleged as a result of the Pediarix (diphtheria-tetanus-acellular pertussis ("DTaP"), hepatitis B ("Hep B"), inactivated

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the Decision will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018).  All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

poliovirus ("IPV")), *Haemophilus influenzae* type B ("Hib"), pneumococcal conjugate 13-valent ("PCV13"), and rotavirus vaccinations administered on April 7, 2017 and Pediarix (DTaP, Hep B, IPV) and PCV13 vaccinations administered on August 1, 2017, K.H. developed "infantile spasms" and "ensuing developmental delay and Lennox-Gastaut syndrome."  Petition at 1-3 (ECF No. 1); Joint Pre-Hearing Submission ("Joint Sub."), filed Feb. 22, 2024, at 1-2 (ECF No. 89).  Respondent argued against compensation, stating that "this case is not appropriate for compensation under the terms of the [Vaccine] Act."  Respondent's Report ("Resp. Rept.") at 1 (ECF No. 28).

After carefully analyzing and weighing the evidence presented in this case in accordance with the applicable legal standards,[3] the undersigned finds that Petitioner has not provided preponderant evidence that the vaccinations K.H. received on April 7, 2017 and August 1, 2017 caused infantile spasms, developmental delay, Lennox-Gastaut syndrome, or any other injury. Thus, she has not satisfied her burden of proof under Althen v. Secretary of Health & Human Services, 418 F.3d 1274, 1280 (Fed. Cir. 2005).  Accordingly, Petitioner is not entitled to compensation.

## I.     ISSUES TO BE DECIDED

The parties' pre-hearing joint submission identified the facts and issues in dispute.  Joint Sub. at 1-3.

The factual disputes include the cause of K.H.'s "infantile spasms (and the alleged ensuing developmental delay and Lennox-Gastaut syndrome),"[4] and whether vaccination was causal.  Joint Sub. at 2.  Additionally, the onset date of Petitioner's alleged vaccine-related injury is in dispute.  Id.

As to issues in dispute, the parties dispute all three Althen prongs for causation: (1) "[w]hether any of the vaccinations K.H. received on April 7, 2017[] and August 1, 2017[] can

---

[3] While the undersigned has reviewed all the information filed in this case, only those filings and records that are most relevant will be discussed.  See Moriarty v. Sec'y of Health & Hum. Servs., 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though [s]he does not explicitly reference such evidence in h[er] decision."); Simanski v. Sec'y of Health & Hum. Servs., 115 Fed. Cl. 407, 436 (2014) ("[A] Special Master is 'not required to discuss every piece of evidence or testimony in her decision.'" (citation omitted)), aff'd, 601 F. App'x 982 (Fed. Cir. 2015); see also Paterek v. Sec'y of Health & Hum. Servs., 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

[4] Although the parties' joint submission also indicated a dispute over whether K.H. was diagnosed with Lennox-Gastaut syndrome, the parties' neurology experts agreed K.H. does not meet the criteria for this diagnosis.  Joint Sub. at 2; Transcript ("Tr.") 37-38, 106, 240-42, 253-55.  Therefore, the undersigned finds this is no longer a factual dispute requiring adjudication.

cause infantile spasms;" (2) "[w]hether any of the vaccinations K.H. received on April 7, 2017[] and August 1, 2017[] did cause K.H.'s infantile spasms (and the alleged ensuing developmental delay and Lennox-Gastaut syndrome);" and (3) "[w]hether [P]etitioner has established a medically appropriate temporal relationship between K.H.'s vaccinations and the onset of K.H.'s infantile spasms." Joint Sub. at 2.

Additionally, Petitioner's expert, Dr. Yuval Shafrir, opined that the vaccinations caused encephalopathy which then caused K.H.'s infantile spasms, not that the vaccinations caused infantile spasms. Tr. 62-64, 98, 118; Petitioner's Exhibit ("Pet. Ex.") 24 at 55, 63 (indicating his theory is that "immunization [] caus[ed] encephalopathy culminating in infantile spasms"); Pet. Ex. 78 at 2 ("[K.H.] did not have infantile spasms after the vaccination. He had an onset of encephalopathy . . . [that] evolved[] [and] [a]s a result . . . , [K.H.] developed infantile spasms."); Pet. Ex. 116 at 10 (explaining encephalopathy preceded the onset of infantile spasms). Thus, the undersigned includes encephalopathy as an alleged vaccine-related injury in her discussion and analysis.

## II.    BACKGROUND

### A.    Procedural History

Petitioner filed her petition on December 2, 2019, followed by medical records[5] on December 4, 2019 and an affidavit on April 20, 2020. Petition; Pet. Exs. 1-21. Thereafter, this case was assigned to a special master. Notice of Reassignment dated Apr. 22, 2020 (ECF No. 14). Respondent filed his Rule 4(c) report, on February 10, 2021, arguing against compensation. Resp. Rept. at 1.

On May 24, 2021, Petitioner filed an expert report from Dr. Shafrir. Pet. Ex. 24. Respondent filed expert reports from Dr. Craig D. Platt and Dr. John Zempel on November 1, 2021. Resp. Exs. A-B.

Thereafter, the special master that was assigned to this case held a Rule 5 conference on February 1, 2022, where he presented questions for the experts. Rule 5 Order dated Feb. 11, 2022 (ECF No. 45). Responsive expert reports from Dr. Shafrir, Dr. Platt, and Dr. Zempel addressing these questions were filed in May and October 2022. Pet. Ex. 78; Resp. Exs. C-D. After a review of these reports, the special master held another status conference during which he noted additional issues in this matter. Order dated Dec. 27, 2022 (ECF No. 58). Petitioner filed a responsive expert report from Dr. Shafrir on April 11, 2023. Pet. Ex. 116. On July 20, 2023, Respondent filed responsive expert reports from Dr. Platt and Dr. Zempel. Resp. Exs. E-F.

An entitlement hearing was held on March 14 and March 15, 2024, with Petitioner, Dr. Shafrir, Dr. Platt, and Dr. Zempel testifying. Tr. 3, 232. Post-hearing briefs were filed between May 10, 2024 and July 30, 2024. Pet. Post-Hearing Brief ("Br."), filed May 10, 2024 (ECF No.

---

[5] Medical records were filed throughout litigation.

96); Resp. Post-Hearing Br., filed July 15, 2024 (ECF No. 98); Pet. Post-Hearing Reply Br., filed July 30, 2024 (ECF No. 99).  Thereafter, this matter was ripe for adjudication.

On March 3, 2026, this case was reassigned to the undersigned for adjudication.  Notice of Reassignment dated Mar. 3, 2026 (ECF No. 105).

## B.    Medical Terminology

"Infantile spasms are an age-specific epileptic disorder of infancy and early childhood." Resp. Ex. F, Tab 3 at 1.[6]  They are usually associated with electroencephalographic ("EEG") evidence of hypsarrhythmia[7] and developmental regression, with a majority (90%) developing symptoms between three and 12 months of age.  Id.  Additionally, a majority (65%-80%) of infants with infantile spasms have an identifiable etiology on neuroimaging (magnetic resonance imaging ("MRI")) or metabolic and genetic testing.  Id.

## C.    Factual History

### 1.    Stipulated Facts

First, "[t]he parties agree[d] the content of the medical records that have been filed in this case thus far are generally accurate."  Joint Sub. at 1.  The parties stipulated to the following facts in their joint submission.  Id. at 1-2.

K.H. was born on January 30, 2017.  Joint Sub. at 1.  K.H. received several vaccinations on April 7, 2017, including Pediarix (DTaP, Hep B, IPV), Hib, PCV13, and rotavirus vaccines. Id.  On August 1, 2017, K.H. received Pediarix (DTaP, Hep B, IPV) and PCV13 vaccines.  Id. All of these vaccines were administered in the United States.  Id. at 2.  Lastly, "K.H. was diagnosed with infantile spasms."  Id. at 1.

---

[6] Danielle S. Takacs & Akshat Katyayan, Infantile Epileptic Spasms Syndrome: Clinical Features and Diagnosis, UpToDate, https://www.uptodate.com/contents/infantile-epileptic-spasms-syndrome-clinical-features-and-diagnosis (last updated Mar. 23, 2023).  For a more detailed description of infantile spasms, see Resp. Ex. D, Tab 3 at 6-7 (E.C. Hancock et al., Treatment of Infantile Spasms (Review), 2013 Cochrane Database Syst. Revs. CD001770).

[7] Hypsarrhythmia "consists of very high-voltage, random, slow waves and spikes in all cortical areas" that "vary in duration and location."  Resp. Ex. F, Tab 3 at 1.  "They appear to originate from one part of the cortex at one moment, then from another or from multiple foci a few seconds later.  The spike discharges occasionally are generalized but never are rhythmically repetitive or highly organized."  Id.  The chaotic appearance "suggests significant cortical dysfunction."  Id.

## 2.    Summary of Medical Records[8]

K.H. was the product of a twin pregnancy, born on January 30, 2017.  Pet. Ex. 2 at 15; Pet. Ex. 5 at 80.  He was seemingly healthy at birth.  Pet. Ex. 2 at 15-39.  At his one-month well-child visit on March 1, 2017, K.H. had mild head asymmetry (plagiocephaly), which Petitioner stated had been present since birth.  Pet. Ex. 7 at 33.  Georgette Sims, M.D., his pediatrician, listed "[a]bnormal head shape" as part of her assessment and instructed Petitioner to rotate K.H.'s head while he slept and to follow up in a month.  Id.  K.H.'s examination and developmental evaluation were otherwise normal.  Id. at 32.

At K.H.'s two-month well-child visit on April 7, 2017, Dr. Sims described K.H.'s head shape and facial asymmetry as "exaggerated plagiocephaly with mild asymmetry" and ordered a head ultrasound, which was negative.  Pet. Ex. 7 at 47.  Among Petitioner's expressed "[p]arental concerns" were "head shape and feeding."  Id. at 44.  Regarding his feeding issues, Petitioner stated that milk leaked from K.H.'s mouth during feedings, he drooled more than his twin, and he had latching issues.  Id. at 47.  Dr. Sims observed these issues when Petitioner attempted to feed K.H. in her office.  Id.  Dr. Sims also observed "frothy bubbles" emerging from K.H.'s mouth throughout her examination and found his feeding issues concerning enough that she reached out to a specialist.  Id. at 47-49.  At this visit on April 7, 2017, K.H. received his routine two-month vaccinations, which included Pediarix (a combined DTaP, Hep B, and IPV vaccine), Hib, PCV13, and rotavirus vaccines.  Pet. Ex. 1; Pet. Ex. 7 at 1, 47.

On April 24, 2017, Petitioner reported she was concerned that K.H. seemed to avoid eye contact and did not engage with family as much as his twin; her concern was heightened "given his head shape and such."  Pet. Ex. 7 at 52.  K.H. had a head computed tomography ("CT") scan on April 25, 2017, which was normal but showed a cavum septum pellucidum et vergae, a common anatomical variant.  Pet. Ex. 9 at 12.  During a telephone call with Dr. Sims on April 28, 2017 to go over the CT results, Petitioner continued to note that K.H. was less social than his twin.  Pet. Ex. 7 at 55.

On May 1, 2017, three-and-a-half weeks after K.H.'s two-month vaccinations, Petitioner reported to Dr. Sims that K.H. was having episodic movements of his arms and legs and abnormal eye movements, which had started the day prior (April 30, 2017).  Pet. Ex. 7 at 55.  She also noted that, in retrospect, these symptoms may have been present earlier.  Id.  Dr. Sims recorded that K.H.'s paternal aunt had a history of seizures.  Id. at 56.  Dr. Sims reviewed a video of K.H.'s movements and was concerned for infantile spasms, and after a consultation with neurology, Dr. Sims recommended Petitioner take K.H. to the emergency room ("ER").  Id.

Later that day, K.H. was evaluated at Johns Hopkins Pediatric ER for possible infantile spasms.  Pet. Ex. 9 at 41, 43-44.  Physical examination in the ER noted K.H. would "fix briefly

---

[8] This summary of medical records is largely taken from Respondent's post-hearing brief as the undersigned finds it provides an accurate representation of the records.  See Resp. Post-Hearing Br. at 4-15.  The undersigned has made edits, deleted less relevant entries, and included additional information.

on bright colored object [but] [would] not follow" and "[l]imited fixing on both Mom's and [doctor's] face." Id. at 34. Although the neurological examination was normal, the physician saw a video taken by Petitioner of K.H. and opined it was "concerning for infantile spasm." Id. Petitioner also noted K.H. was "not developing at the same rate as twin." Id. at 44. He was "awake, alert, fussy but consolable," and "eating well." Id. ER diagnosis was "epileptic syndrome, not intractable, without status epilepticus." Id. at 37.

A routine EEG was abnormal and suggested K.H. had a seizure disorder of multifocal origin. Pet. Ex. 9 at 44. K.H. was admitted for a work-up for "epilepsy/infantile spasms" and had a continuous EEG that showed hypsarrhythmia, a pattern associated with infantile spasms, as well as a subclinical left temporal lobe seizure. Id. at 48-52, 87-89. "The EEG suggest[ed] the presence of severe seizure disorder of multifocal origin. Although the EEG [did] not meet formal voltage criteria for hypsarrhythmia, it can be described as modified hypsarrhythmia and the clinical-electrographic seizures are consistent with infantile spasms."[9] Id. at 89. K.H. was "loaded with Keppra" and started on Topamax. Id. at 52, 190. K.H.'s treating physicians performed additional studies to try to identify the cause of his infantile spasms; however, K.H.'s brain MRI was unremarkable and laboratory testing and cerebrospinal fluid ("CSF") testing did not reveal any abnormality that would explain his condition. Id. at 54-56. K.H. was discharged on May 2, 2017, on high-dose steroids, with no etiology for his spasms having been identified. Id. at 53-60. K.H.'s discharge diagnosis was infantile spasms. Id. at 57.

After discharge, K.H. continued to have spasms and his neurologist, Melissa Carrasco McCaul, M.D., Ph.D., increased his steroids on May 5. Pet. Ex. 10 at 156. Petitioner reported she had learned that two of K.H.'s paternal aunts had seizure disorders and that one developed seizures in infancy. Pet. Ex. 7 at 59. In addition to the pre-existing family history of seizures, K.H.'s father was hospitalized in May 2017 for first-time seizures, which required intubation. Pet. Ex. 10 at 244, 386.

At a neurology follow-up with Dr. McCaul on May 10, 2017, K.H. had not had any further spasms since Dr. McCaul increased his steroids. Pet. Ex. 9 at 214-17. Dr. McCaul's plan was to slowly taper his oral steroids. Id. at 217.

K.H. had a follow-up with Dr. Sims on May 15, 2017, and was noted to be spasm free. Pet. Ex. 7 at 61. Dr. Sims wrote K.H. "fixes on face more, [although] for brief periods." Id. Petitioner reported that the day before, K.H. watched his older siblings play. Id. Although a thorough neurologic examination was not documented, examination was normal, and K.H. seemed more aware of his environment, with some improvement in his development. Id. at 61-62. Dr. Sims referred K.H. to genetics and the Kennedy Kruger Institute ("KKI") for Neurologic Development. Id. at 62.

K.H. returned to Dr. Sims on May 22. Pet. Ex. 7 at 62. Petitioner reported that on May 19, K.H. possibly had two spasms during an episode of spitting up. Id. Neurologic examination

---

[9] But see Pet. Ex. 9 at 52 (noting the EEG showed "classic hypsarrhythmia").

noted hypotonia.[10]  Id. at 63.  At another follow-up on May 31, Petitioner reported sporadic "symmetric slow arm raising activity."  Id. at 64.  No neurologic physical examination was documented.  Id. at 65.  Dr. Sims' assessments included "[i]nfantile spasms" and "[d]evelopmental concern" despite noting "[m]ilestones are improving."  Id.

On June 5, 2017, K.H. had his four-month well-child visit with Dr. Sims and had several developmental deficits.  Pet. Ex. 7 at 70-73.  K.H. was unable to push chest up to elbows, he did not have good head control, and he was not beginning to roll and reach for objects.  Id. at 71.  K.H. had a "cluster of spasms" that morning, despite the high-dose steroids he restarted two days prior.  Id. at 73.  Neurologic examination documented diffuse hypotonia.  Id.  Petitioner deferred his four-month vaccines since he was on high-dose oral steroids.  Id. at 73-74 ("Vaccines deferred due to high dose Prednisone therapy.").

On June 12, 2017, at a follow-up appointment with Dr. Sims, Petitioner noted K.H. was spasm free since June 5.  Pet. Ex. 7 at 75.  Petitioner also reported "improving developmental milestones," including "better tracking."  Id.  K.H. was noted to have periods of apnea and increased work of breathing.  Id.  Assessment included respiratory distress, and K.H. was referred to the ER for further evaluation.  Id. at 76.  ER diagnosis was "periodic breathing."  Id. at 78.  At the ER, he was again assessed as hypertonic.  Id. at 79.  He was diagnosed with an upper respiratory infection at a follow-up office visit.  Id. at 80.

On June 20, 2017, K.H. was taken to the ER for worsening respiratory problems.  Pet. Ex. 7 at 83.  He was admitted to the pediatric intensive care unit for "human metapneumovirus bronchiolitis with respiratory distress and apnea/periodic breathing."  Id. at 86.  He was hypertensive on admission, which was thought to be secondary to steroid use or agitation, but his blood pressure improved once he was transitioned to a manual blood pressure measurement.  Id. at 87-88.  Neurology examination noted a "[c]oncern that apneic episodes/periodic breathing could be related to seizures."  Id. at 87.  K.H. was given Keppra.  Id.  He underwent a spot EEG that "did not show any correlating seizure activity but did show diffuse cerebral disturbance."  Id.  A continuous EEG also did not show any seizure activity.  Id.  K.H. was discharged on June 27, 2017.  Id. at 85-91; Pet. Ex. 2 at 46-52.  At a follow-up visit on June 29, Petitioner reported developmental improvements in K.H., including sucking thumb, looking at Petitioner, smiling more, and tracking better.  Pet. Ex. 7 at 88.  Examination confirmed K.H. was able to "partially track" and he was noted to be cooing.  Id. at 90.

K.H.'s steroids were tapered over the course of the summer.  Pet. Ex. 7 at 92.  Based on the taper schedule, he completed high-dose steroids on July 2, 2017, and ceased taking steroids

---

[10]  Hypotonia is "a condition of diminished tone of the skeletal muscles, so that they have diminished resistance to passive stretching and are flaccid."  Hypotonia, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=24433 (last visited June 1, 2026).

entirely in mid-July.[11]  Id.; Pet. Ex. 20 at 539.  At a follow-up visit with Dr. Sims on July 6, K.H. was spasm free for four weeks, his respiratory issues were resolving, and he was noted to have "[p]ersistent plagiocephaly despite improved tolerance of tummytime."  Pet. Ex. 7 at 93.  K.H. was referred to STARR cranial center and physical therapy ("PT").  Id.  At another follow-up on July 13, 2017, K.H. remained spasm free, his physical examination was normal, and it was his final week of his steroid taper.  Id. at 94-95.

At his six-month well-child visit on August 1, 2017, K.H. had significant developmental delay.  Pet. Ex. 7 at 99-104.  He was not using "visual exploration to learn about the environment" or "beginning to use oral exploration for learning" and he was not learning to rotate in sitting position and eventually to crawling position.  Id. at 101.  He still had plagiocephaly with mild facial asymmetry but was spasm-free.  Id. at 103.  Examination also noted that his tone was improving.  Id.  Assessment documented K.H. "continue[d] to progress" developmentally.  Id.  K.H. received his second Pediarix (DTaP, Hep B, IPV) and PCV13 vaccines.  Pet. Ex. 1 at 1; Pet. Ex. 7 at 104.

On August 15, 2017, K.H. had a follow-up with his neurologist, Dr. McCaul.  Pet. Ex. 9 at 667-75.  K.H. remained delayed in many milestones and he had been having events during sleep "for months" that involved his eyes twitching and moaning.  Id. at 668-70.  A detailed developmental history documented K.H. tracked inconsistently, was able to sit supported, was not reaching for objects, did not transfer objects from hand to hand, recognized Petitioner but it was not clear whether he recognized other family members, and he babbled and smiled, but not reciprocally.  Id. at 668.  He was also attending Infants and Toddlers weekly.  Id.  Examination revealed "[n]o social smile;" "left gaze preference, only appears to fixate [] briefly, does not track;" "[d]ecreased axial tone [with] significant head-lag and slip-through on vertical suspension;" and "[d]id not bat at objects held in front of him."  Id. at 669.  Dr. McCaul's assessment was "multifocal seizures and infantile spasms."  Id. at 670.  K.H.'s "[s]pasms resolved since" and he was doing well on his medication.  Id.  Dr. McCaul noted examination again revealed "left gaze preference, limited ability to fixate, [and] unclear ability to track."  Id.  Dr. McCaul referred K.H. to the Neurodevelopmental Medicine Program at KKI.  Id. at 670-71.

At an ophthalmology appointment on August 30, 2017, K.H.'s visual attention was below normal for his age, and the ophthalmologist explained his vision issues were likely associated with his seizures.  Pet. Ex. 9 at 682-83.  No behavioral, mental status, or other complaints were noted.  Id.

On September 1, 2017, one month after K.H.'s August 1, 2017 vaccinations and about two months after K.H.'s cessation of high-dose steroids, Petitioner called Dr. Sims to report a new occurrence of possible infantile spasms.  Pet. Ex. 7 at 108.  On September 2, 2017, Dr. McCaul formally diagnosed a recurrence.  Pet. Ex. 10 at 657.  K.H. resumed steroid therapy.  Id.; Pet. Ex. 7 at 109.  K.H. continued to have spasms over the next week, and his pediatrician, Naomi Rebecca Rios, M.D., increased his steroids.  Pet. Ex. 7 at 110-14.  An examination note

---

[11] During his testimony, Dr. Platt carefully walked through the medical records, specifically discussing K.H.'s steroid weaning schedule, and determined that high-dose steroids would have ended July 2, 2017.  Tr. 333 (citing Pet. Ex. 20 at 539).

8

from September 6, 2017 noted that developmentally, he had not lost milestones. Id. at 111. An EEG conducted September 7, 2017 showed the presence of a seizure disorder of multifocal origin. Pet. Ex. 9 at 690-91. When discussing the EEG results with Petitioner, she reported to Dr. McCaul that K.H. had a few episodes of vomiting since the day prior, which Petitioner was concerned was due to viral gastroenteritis. Id. at 693.

K.H. saw Dr. McCaul on September 12 for a follow-up examination. Pet. Ex. 9 at 700. Petitioner reported K.H. was "doing well[,] [w]ith no further regression [with] recurrence of [infantile spasms]." Id. at 701. Petitioner also noted K.H. "seems to be fixating and tracking more as time goes by" and he was "[p]erhaps smiling 'a little less' than before, but has also been sick with viral gastroenteritis over the past [six] days." Id. Developmental history at that visit documented "[t]racking more consistently (improved from a month ago), sits unsupported but a bit wobbly (improved from a month ago), can sit supported without issue, does not transfer objects from hand to hand," "recognizes mom (unclear if he recognizes other family members), no stranger danger, [and] smiles spontaneously though not reciprocally." Id. Neurological examination revealed "[n]o social smile;" "no longer with gaze preference, able to fixate and track toy horizontally to his left and his right, though not vertically;" "[d]ecreased axial tone [with] significant head-lag;" "[a]ble to sit unsupported though unstable/wobbly;" and "[d]id not bat at objects held in front of him." Id. at 701-02. Assessment remained "multifocal seizures and infantile spasms." Id. at 703. Dr. McCaul noted the "[s]pasms have recurred," examination that day was "reassuring, with improved ability to track, compared to a month ago," and steroids "decreased frequence of spasms but did not fully resolve" spasms so K.H. was to start vigabatrin. Id.

On September 18, 2017, K.H. had a consultation and examination with Meral Gunay-Aygun, M.D., a specialist in genetic medicine, to discuss additional genetic testing. Pet. Ex. 9 at 714-21. Petitioner had undergone chromosomal single nucleotide polymorphism ("SNP") testing during his hospital admission in June 2017, which Dr. Gunay-Aygun indicated returned normal results. Id. at 379-83, 719-20. Dr. Gunay-Aygun noted K.H.'s significant family history of seizures. Id. at 718. Panel testing to look at specific genes associated with seizures was ordered and returned normal. Id. at 720, 756-57. K.H. went on to have whole exome sequencing ("WES"), as did K.H.'s twin, K.H.'s father, and Petitioner. Id. at 757. On April 3, 2018, genetic testing revealed that K.H. was homoplasmic for an m.14511 C>T variant of uncertain significance in the MT-ND6 gene. Pet. Ex. 17 at 1-2. Petitioner's testing revealed the same variant. Id. at 1. The interpretation was that if Petitioner did not have symptoms of a mitochondrial disorder with this variant, it was not likely the cause of K.H.'s condition. Id.

K.H. returned to Dr. McCaul on October 3, 2017. Pet. Ex. 9 at 744. Under developmental history, Dr. McCaul documented K.H. was "[t]racking more consistently recently (improved from a month ago), sits unsupported but a bit wobbly (improved from a month ago), can sit supported without issue, now transferring objects from hand to hand (new as of today's visit)," "recognizes mom (unclear if he recognizes other family members), no stranger danger, [and] smiles spontaneously but not reciprocally." Id. at 744-45. K.H. also "[h]as interest in rolling but has not completed yet;" he was "[n]ow noticing both hands [] [and] sucks at both hands per Mom;" he could "bear weight on both feet;" and he was laughing and imitating grunting. Id. at 745. Neurological examination continued to reveal "[n]o social smile;" "no

longer with gaze preference, able to fixate and track toy horizontally;" "[d]ecreased axial tone [with] significant head-lag that [was] improving;" "[a]ble to sit unsupported though unstable/wobbly;" and "[d]id not bat at objects held in front of him." Id. Assessment was "idiopathic infantile spasms," with "recurre[nce] as of early September" and "[n]o evidence of other seizure types." Id. at 747. Assessment further noted, "[e]xam[ination] today again reassuring;" K.H. had "[n]o loss of milestones following recurrence[] [and] has actually been gaining some new skills, including transferring of objects from hand to hand, since spasms started." Id. Dr. McCaul added that "[g]iven that spasms continue, will go up on vigabatrin dose again today." Id.

On November 1, 2017, six months after K.H. was diagnosed with infantile spasms, he had his nine-month well child visit with Dr. Sims. Pet. Ex. 7 at 132-37. He was significantly developmentally delayed but remained spasm free. Id. at 136. Petitioner chose to defer vaccines due to her "concern[] that there may be a connection with infantile spasms as there was a temporal relationship." Id. Dr. Sims reviewed with Petitioner that "there is no proven relationship between vaccines and infantile spasms and there is no contraindication to vaccines." Id. at 136-37. Nonetheless, Petitioner continued to decline vaccination. Id. at 137.

K.H. had an evaluation with KKI Developmental Clinic on December 6, 2017. Pet. Ex. 11 at 281. At ten months old, his development was that of a three-month-old. Id. at 285. Diagnosis included global developmental delay. Id. He was referred for PT and occupational therapy ("OT"). Id.

On February 6, 2018, Dr. McCaul noted that K.H.'s spasms had resolved with vigabatrin (which he had started on September 16, 2017). Pet. Ex. 9 at 764-65. Developmental history summarized, "[t]racking more consistently recently, sits unsupported but wobbly (no significant improvement since last seen in clinic October 2017), can sit supported without issue, [and] transferring objects from hand to hand, [though] [right] hand appears 'weaker' to family/will drop items handed to that hand" with "[p]refer[ence] to use [left] hand to reach out for toys." Id. at 764. K.H. was seeing PT, OT, vision services, and speech services with developmental teacher. Id. Physical examination revealed "[s]miled with tickles;" "no longer with gaze preference, able to fixate on [] face briefly but did not track;" "[d]ecreased axial tone [with] significant head-lag that [was] improving; upper extremity tone normal/symmetric; lower extremity tone decreased/symmetric;" "[a]ble to sit unsupported for a few seconds, but unstable/wobbly;" "[w]obbly on feet when brought to stand;" and "[d]id not reach out for toys held in front of him." Id. at 765. Dr. McCaul's assessment noted K.H.'s examination that day was "again reassuring," with "[n]o loss of milestones following recurrence[] [and] [he] ha[d] been gaining some new skills." Id. at 766.

As of his one-year-old well-child visit on February 12, 2018, K.H. was still on Topamax and vigabatrin and continued to follow with ophthalmology and genetics. Pet. Ex. 7 at 166-72. Petitioner again declined immunizations due to her concern that K.H.'s vaccinations had caused his spasms. Id. at 171. Dr. Rios wrote, "[Petitioner] knows providers have told her it's not related and she is not convinced that it is. However, she prefers to be cautious until they are older and she feels more comfortable." Id. Dr. Rios "[r]eiterated what other providers have said to dissuade this belief," explained the risks and benefits of vaccination, and noted all major

10

medical organizations recommend vaccination; however, Petitioner was "adamant" that K.H. not be vaccinated.  Id.

An EEG conducted May 7, 2018 was again consistent with a multifocal seizure disorder. Pet. Ex. 9 at 834-36.  On May 31, 2018, K.H. had his sixteen-month well-child visit, and developmentally, he remained behind.  Pet. Ex. 7 at 182-89.  Petitioner again refused vaccinations for K.H.  Id. at 187.

During a June 4, 2018 developmental follow-up at KKI, K.H., at seventeen months old, had a developmental age ranging from five months to seven months.  Pet. Ex. 11 at 245-48.  He also engaged in concerning movements, such as hand flapping.  Id.

As of his eighteen-month well-child visit, on August 24, 2018, K.H. remained free of his "idiopathic infantile spasms"[12] since October 5, 2017.  Pet. Ex. 7 at 190.  Dr. Rios noted K.H. was at "high risk" for autism and recommended an evaluation for early intervention.  Id. at 192.

On November 19, 2018, K.H. had a genetics follow-up with Krista Sondergaard Schatz, M.S., a genetic counselor.  Pet. Ex. 20 at 289-93.  Ms. Schatz discussed that K.H.'s latest testing results showed he had two variants of uncertain significance in the MTR gene, as well as one variant of uncertain significance in the mitochondrial genome.  Id. at 289.  Ms. Schatz noted the MTR gene is associated with autosomal recessive methylcobalamin deficiency type cobalamin G ("cblG"), and that while someone would need two of these genes to have the disorder, the disorder has symptoms that overlapped with K.H.'s symptoms.  Id. at 292.  However, she determined there was not enough evidence to conclude that K.H. had the condition.  Id.  Ms. Schatz further recounted K.H.'s development and family history of seizure disorder.  Id. at 290-91.  Ms. Schatz noted that the precise cause of K.H.'s problems was unclear, but expressed that "most likely[,] [] [K.H.] has an underlying genetic condition that is the cause of his medical history, and that the vaccines were likely not the cause."  Id. at 292.  She also indicated that since K.H.'s first EEG was after onset of his symptoms, "we cannot determine when the onset of epileptiform activity was in [K.H.], though we suspect it would have been present at birth."  Id. She noted that while she understood the family's hesitancy vaccinating K.H., she recommended vaccination "given the risk that is associated with not receiving vaccines."  Id.

The records from a November 21, 2018 ear, nose, and throat ("ENT") appointment reflect that Petitioner reported that K.H.'s brother had been diagnosed with autism, and that the diagnosis was "temporally correlated with [the] vaccination schedule."[13]  Pet. Ex. 10 at 881-85; see also Pet. Ex. 20 at 230.  They discussed K.H.'s ongoing feeding issues and he was diagnosed with feeding difficulty, pharyngeal dysphagia, difficulty with salivary management, developmental delay, infantile spasms, and expressive language delay.  Pet. Ex. 10 at 885.

---

[12] K.H.'s infantile spasms were categorized as idiopathic on numerous occasions.  See, e.g., Pet. Ex. 110 at 25, 56 (reflecting K.H.'s infantile spasms/epilepsy were "idiopathic"); Pet. Ex. 23 at 324 (neurologist calling K.H.'s spasms "idiopathic" on July 29, 2019).

[13] However, at the hearing, Petitioner stated that K.H.'s brother did not carry an autism diagnosis.  Tr. 34-35.

Treatment records from December 2018 through June 2019 show K.H. continued to demonstrate developmental delays and feeding difficulties, and that he had follow-ups for his development and with neurology.  See, e.g., Pet. Ex. 10 at 914-16; Pet. Ex. 11 at 97; Pet. Ex. 14; Pet. Ex. 15; Pet. Ex. 20 at 223-31.

At a March 23, 2019 two-year-old well-child visit, Petitioner again noted that providers had told her K.H.'s spasms were not related to his vaccinations and she acknowledged she was not convinced they were related; nonetheless, she continued to refuse vaccinations.  Pet. Ex. 115 at 87.

K.H. had seizure activity in the summer of 2019.  See Pet. Ex. 20 at 3-9; Pet. Ex. 23 at 166.  On August 29, 2019, K.H. had a feeding disorder follow up.  Pet. Ex. 109 at 250-62.  He was dependent on formula and refusing solid foods.  Id. at 250, 253.  K.H. continued to have follow-up appointments for his feeding disorder over the following years.  See, e.g., id. at 14-23, 53-63, 136-48, 185-99, 210.

On September 12 and 18, 2019, K.H. had developmental pediatrics evaluations.  Pet. Ex. 22 at 1-13; Pet. Ex. 114 at 2-14.  K.H. saw Pamela Compart, M.D., a pediatrician and integrative medicine physician, who diagnosed him with a global developmental delay with autistic-like features.  Pet. Ex. 22 at 3-5; Pet. Ex. 114 at 4-6.

An October 14, 2019 overnight EEG suggested "mild encephalopathy and showed myoclonic seizures" with "some features" of Lennox-Gastaut syndrome. Pet. Ex. 23 at 33-34, 88, 155-56; Pet. Ex. 110 at 124, 142-48.

Additional genetic testing showed that K.H. had a "cobalamin G variant" or cblG (vitamin B12 deficiency).  Pet. Ex. 114 at 73.  Dr. Gunay-Aygun felt the most important treatment to address it was hydroxocobalamin injections, but K.H.'s parents did not want K.H. to have them.  Id.  She recommended an acylcarnitine profile (to check for genetic disorders related to fatty acid oxidation and several organic acidurias).  Id.  In February 2021, K.H.'s acylcarnitine profile showed a high octenoyl C8:1, Deconolyl C10, and 3-Hydroxytetradecanoyl C14-OH.  Pet. Ex. 115 at 1225-27.

On October 21, 2020, K.H. had an overnight EEG.  Pet. Ex. 109 at 149.  On November 29, 2020, Petitioner emailed Dr. Compart to report K.H.'s October 21, 2020 EEG showed some abnormal spiking, more prominent during sleep, but did not indicate an epileptic encephalopathy.  Pet. Ex. 114 at 32.  Petitioner noted the epilepsy physicians did not think the EEG showed Lennox-Gastaut syndrome.  Id.

12

From January 3 to January 15, 2021, K.H. was admitted to the hospital for Fanconi syndrome,[14] thought to be due to his use of Valproic acid.  Pet. Ex. 112 at 100; Pet. Ex. 114 at 20.  K.H. had a gastronomy ("G-tube") placed during this admission.  Pet. Ex. 109 at 127.

A March 3, 2021 note by Matt Merguerian, M.D., Ph.D., a pediatric hematologist, noted "[K.H.] has had macrocytosis his entire life. . . .  In this patient with increased [mean corpuscular volume ("MCV")[15]], moderate anemia, and a peripheral smear showing multiple forms of poikilocytosis, and also a decreased osmotic fragility, my suspicion is increased for hereditary xerocytosis or hereditary cryohydrocytosis."  Pet. Ex. 115 at 1139-40.  He noted that he had been in touch with the company that conducted K.H.'s WES analysis and they indicated K.H. had two variants of unknown significance in PIEZEO1.  Id. at 1140.  Dr. Merguerian explained the significance of the testing results:

> Since PIEZO1 is the gene typically implicated in hereditary xerocytosis,[16] the form of stomatocytosis[17] for which I have the greatest suspicion based on the clinical picture, I think it would be worth following up with further genetic and functional testing.  They did not perform review on RHAG, SLC4A1 (Band3), ABCR6, ABCG5, ABCG8, SPTA1, SPTB, EPB42, so these are other genes

---

[14] Fanconi syndrome is "any of a broad group of congenital and acquired disorders marked by generalized dysfunction of proximal renal tubule transport. . . .  Common characteristics include aminoaciduria, glycosuria, hypophosphatemia, bicarbonate and water loss, hypouricemia, and growth retardation."  Fanconi Syndrome, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=110592 (last visited June 1, 2026).

[15] See also Pet. Ex. 110 at 68, 257 (noting high MCVs on August 8, 2019 and February 19, 2020).

[16] Xerocytosis refers to the "presence of xerocytes in the blood," which is "an erythrocyte that is dehydrated and has decreased cations due to abnormal permeability of the membrane that allows leakage of potassium ions and water out of the cell."  Xerocytosis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=53866 (last visited June 1, 2026); Xerocyte, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=53865 (last visited June 1, 2026).

[17] Stomatocytosis is "the presence of stomatocytes in the blood, as seen in liver disease, Rh null syndrome, a rare congenital type of hemolytic anemia, and a few other conditions."  Stomatocytosis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=47327 (last visited June 1, 2026).  A stomatocyte is "an abnormal erythrocyte in which a slit or mouthlike area replaces the normal circle of pallor, usually due to edema."  Stomatocyte, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=47326 (last visited June 1, 2026).

associated with stomatocytosis and spherocytosis[18] that could be investigated in the future.  The other genetic consideration to note for this case is the description in the literature of families with SLC2A1 variants with cryohydrocytosis and seizures together in the affected individuals.

Id.

On May 21, 2021, Dr. Rios discussed K.H.'s admission for a drug-induced liver injury and noted he was re-admitted on April 8, 2021 for vomiting, and during that admission, he had a normal brain MRI and a liver biopsy.  Pet. Ex. 115 at 1138.  The biopsy showed variable eosinophilia with some pale and some red cytoplasm of uncertain significance, and his mitochondria showed marked pleomorphism; his providers believed his mitochondrial abnormality could be primary or secondary but could not be excluded and that it called for additional genetic testing.  Id. at 1139.  Dr. Rios also noted "autism-like behaviors."  Id. at 1138.

On August 30, 2021, K.H. had a Developmental Medicine Evaluation at KKI Center for Autism Related Disorders and was diagnosed with autism spectrum disorder ("ASD" or "autism").  Pet. Ex. 109 at 101-14.

On February 13, 2022, K.H. had a follow-up neurology appointment at KKI with Christina Morris-Berry, M.D., for his seizures and ASD.  Pet. Ex. 109 at 65-71.  She did not note any major changes in his condition; he was to follow up with genetics.  Id. at 65-66.

On June 14, 2022, K.H. had a well-child visit with Dr. Rios, who gave updates on his progress from a multitude of standpoints, including feeding, gastroenterology, neurology, developmental, and behavioral.  Pet. Ex. 115 at 959-67.  Developmentally, he continued to have significant delay.  Id.; Pet. Ex. 128 at 4, 16-24 (showing that during an evaluation on May 3, 2022, K.H.'s language level was that of a zero to 18-month-old).  K.H. had applied behavioral analysis ("ABA") therapy sessions for his ASD throughout 2022.  See Pet. Ex. 129 at 113-830.

As of his neurology follow-up appointment with Dr. Morris-Berry on October 2, 2022, K.H. had been seizure-free for three years (September 25, 2019 was listed as the date of his last seizure) and he was feeding completely by mouth, although he still had a G-tube.  Pet. Ex. 109 at 4-5.  K.H. still did not speak.  Id. at 5.  His G-tube was removed on January 22, 2024.  Pet. Ex. 131 at 40.

---

[18] Spherocytosis is "the presence of spherocytes in the blood," which are "small, globular, completely hemoglobinated erythrocyte[s] without the usual central pallor, found characteristically in hereditary spherocytosis but also observed in acquired hemolytic anemia." Spherocytosis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=46504 (last visited June 1, 2026); Spherocyte, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=46502 (last visited June 1, 2026). Spherocytosis may require blood transfusions for management and treatment.  Hereditary Spherocytosis, Clev. Clinic, https://my.clevelandclinic.org/health/diseases/23058-hereditary-spherocytosis (last updated Jan. 26, 2026).

On January 1, 2023, K.H. had a follow-up for his ASD.  Pet. Ex. 128 at 66.  He was nonverbal and had some challenging behavior.  Id. at 66, 68.  A March 14, 2023 audiological evaluation revealed K.H. also had bilateral conductive hearing loss.  Pet. Ex. 130 at 5.  K.H. engaged in ABA therapy for his ASD throughout 2023.  See Pet. Ex. 129 at 834-2997.

At the entitlement hearing in March 2024, Petitioner testified K.H. was in kindergarten, was still nonverbal, and received regular ABA therapy for his ASD.  Tr. 39-41.

### 3.    Petitioner's Hearing Testimony[19]

At the hearing, Petitioner shared her recollection of the birth of her twin boys.  Tr. 10.  She testified the boys had no problems and were released from the hospital after two or three days.  Tr. 10-11.  The boys were happy and healthy and developing normally.  Tr. 11.  Petitioner described issues related to breastfeeding the twins and K.H.'s head shape was "a little flat in the back," but otherwise, she had no concerns.  Id.  Subsequently, K.H. underwent a CT scan and was informed that K.H.'s head asymmetry would resolve.  Tr. 12.

On April 7, 2016, the twins saw Dr. Sims (pediatrician), and both boys met their developmental milestones.  Tr. 11-12.  Other than "feeding and [] head shape," Petitioner had no concerns.  Tr. 12.  Petitioner's family came for a visit on April 15, and Petitioner noticed that her family "gravitated more toward [J.H.] than they did to K.H." because he was "not friendly" and would not make eye contact.  Tr. 12-13.  Petitioner also noticed that K.H. was not making eye contact, and he had "stopped tracking objects, which was completely a 180 from what he had done the week prior."  Tr. 13.

K.H.'s first seizure that Petitioner noticed occurred April 30, 2017.  Tr. 13-14.  K.H. had been nursed and he was sitting on him mother's lap, when he had a "very weird stretch, and his eyes danced in his head."  Tr. 14.  She searched "baby stretch, eyes jump" on Google, and the search showed infantile spasms, among other things.  Id.  Hours later, when K.H. awoke from a nap, K.H. had the stretch again, and Petitioner recorded it.  Id.  The next morning, May 1, she took K.H. to the doctor's office, and a nurse practitioner saw K.H.'s stretch/spasm and informed Petitioner K.H. had a "severe case of silent reflux."  Tr. 15.  Due to her concern, Petitioner waited two hours to see Dr. Sims, who advised Petitioner that K.H. may have reflux, but that "given his regression with his milestones, . . . it could be infantile spasms."  Id.  Dr. Sims arranged for K.H. to be seen at John Hopkins Children's Hospital where K.H. had an EEG that showed infantile spasms with hypsarrhythmia and multiple multifocal epilepsy.  Tr. 16.  K.H. was prescribed prednisolone steroid and Topamax for his seizure disorder.  Id.

Petitioner testified that after starting medication, K.H.'s infantile spasms became "more subtle, even harder to see" and they were not controlled until early June 2017.  Tr. 16.  She averred that some of K.H.'s developmental milestones "were starting to return."  Id.  K.H. was starting to look at Petitioner a "little more than he had" and he "started sucking his thumb," and Petitioner was very hopeful.  Tr. 16-17.

---

[19] Petitioner also filed an affidavit on April 20, 2020.  Pet. Ex. 21.  It is not dated or notarized, and it contains most of the same information provided during the hearing.

15

On June 12, K.H. had an appointment with Dr. Sims, who noticed that K.H. was having periods when he was not breathing. Tr. 17. K.H. was transported to the ER for observation. Id. At that time, his face was very swollen from the steroids. Tr. 18.

Prior to his vaccinations on August 1, 2017, Petitioner testified that K.H. was on Topamax, but she could not recall whether his prednisolone weaning had begun. Tr. 17-18. She could not remember if K.H. had been weaned off prednisolone or not by August 1, 2017. Tr. 17, 42. Petitioner testified that K.H. was supposed to start weaning off the prednisolone about June 12, but then he had the episodes where he would stop breathing, and she does not recall if the weaning off the medication was delayed. Tr. 17, 43. When informed on cross-examination that the medical records show that K.H. was taking prednisolone 15 mL three times per day from June 12 to June 18, Petitioner agreed that the prednisolone weaning was delayed. Tr. 43.

Prior to August 1, Petitioner indicated K.H. was "returning to some normalcy. He wasn't all the way back, but [she] was starting to see glimmers of hope for him." Tr. 18-19. Petitioner recalled being excited in July for his development and the fact that he had "remained seizure-free." Tr. 45.

After his vaccinations on August 1, Petitioner stated that K.H.'s development "started to really slow;" "he started to develop more at a snail's pace" and "wasn't making as much eye contact as he had been after we got the spasms under control the first time." Tr. 19; see also Tr. 44-45. When asked if K.H. regressed, Petitioner said "[o]n one hand, yes." Tr. 45. Petitioner had begun to see new developments but after his vaccinations, those were not as consistent. Id. For example, in June and July 2017, K.H. had started to suck his thumb, have more eye contact, and paid attention to toys, and after August 1, he was "not as consistent." Id.

On August 10, Petitioner emailed Dr. McCaul to express concerns and to report "weird moaning and eye twitches in [K.H.'s] sleep." Tr. 19. Then on September 1, K.H. had spasms at daycare. Tr. 19-20. Petitioner was distraught that the seizures had returned. Tr. 20. She contacted Dr. McCaul and restarted the prednisolone medication. Tr. 20-21. The prednisolone did not work, and vigabatrin was started, and the prednisolone was replaced with Sabril. Tr. 21. These medications controlled the seizures and K.H. started back developing, but slower. Id. He learned to walk, and he was developing again, but "it was really, really slow, and to this date, he's still very, very significantly delayed." Id.

Over a period of time, after his developmental progress was still slow, K.H. had testing and he was given the diagnosis of ASD in 2021. Tr. 21. The family, including K.H., his twin brother, and his parents, underwent genetic testing and they were told they had a genetic "variance of uncertainty" but there was no cause for the epilepsy. Tr. 22. Petitioner described the family history of seizures. Tr. 22-23. At the time of the hearing, K.H.'s twin brother was "a typical seven-year-old" in first grade. Tr. 23. K.H. was "nonverbal, he's not potty-trained, and [the] family is still reeling from the effects of what happened to him on April 7, 2017." Tr. 23-24. Petitioner described some of K.H.'s behavior and his lack of understand of danger. Tr. 24. She described K.H.'s allergic reaction to seizure medication and diagnosis with Fanconi syndrome, a rare condition, which caused liver and kidney inflammation and resulted in a G-tube

16

for feeding.  Tr. 25.  In 2022, K.H. attended a hospital-based feeding program, and he learned to eat, and now he eats "everything in sight."  Tr. 26.

Petitioner also described submitting a report with the Vaccine Adverse Event Reporting System ("VAERS") and the timeline of contacting a lawyer.  Tr. 29-30.  During cross-examination, Petitioner agreed that she was honest with K.H.'s physicians and truthfully reported his symptoms.  Tr. 30.  Petitioner's husband, K.H.'s father, had a seizure in May 2017, and she described the events of that seizure.  Tr. 31-32.  She also described additional genetic testing for dermatophytosis,[20] and that K.H. and Petitioner had the condition.  Tr. 34.  Petitioner was advised that if they become ill, they may need a blood transfusion.  Id.

In 2019, Petitioner sought a second opinion at Children's National with Dr. Claudine Sinsioco for "weird eye things" K.H. had in the mornings upon wakening and concern about whether he had Lennox-Gastaut syndrome.  Tr. 36.  The eye flicks were myoclonic epilepsy, and K.H. was taken off Topamax and prescribed Depakote.  Id.  Children's National did not believe K.H. had all three criteria for Lennox-Gastaut syndrome because he did not have multiple seizure types that were difficult to control.  Tr. 36-37.  Additionally, K.H.'s EEG did not show a Lennox-Gastaut pattern.  Tr. 38.

At the time of the hearing, K.H. attended kindergarten five days a week in a full-time program.  Tr. 39.  He loved school, being outside, running, jumping, climbing, and cuddling.  Tr. 39-40.  Petitioner described the services K.H. is receiving for speech, communication, and ASD.  Tr. 40-41.  For seizures, K.H. was taking only Clobazam, which he had been taking since 2019.  Tr. 41.

### D.    Expert Reports

#### 1.    Petitioner's Expert, Dr. Yuval Shafrir[21]

##### a.    Background and Qualifications

Dr. Shafrir is board certified in neurology, with special qualification for pediatric neurology, and EEG and clinical neurophysiology.  Tr. 53.  He received his M.D. from Tel Aviv University, Sackler School of Medicine in Israel and completed an internship and residency rotations at hospitals in Israel.  Tr. 52.  Dr Shafrir finished his pediatric residency at North Shore University Hospital in New York.  Id.  He then completed a fellowship in pediatric neurology at

---

[20] This word may represent an error in the transcript, as it is inconsistent with the results of the genetic testing and medical records identifying other genetic disorders which are more appropriate given the context of Petitioner's testimony.  See supra pp. 11-14.  Dermatophytosis is a fungal infection that is not treated with blood transfusions.  See Denise M. Aaron, Overview of Dermatophytoses (Ringworm, Tinea), Merck Manual, https://www.merckmanuals.com/home/skin-disorders/fungal-skin-infections/overview-of-dermatophytoses-ringworm-tinea (last rev. Oct. 2025).

[21] Dr. Shafrir submitted three expert reports.  Pet. Exs. 24, 78, 116.

Washington University Medical Center in Missouri and a second fellowship in pediatric neurophysiology and epileptology at Miami's Children's Hospital in Florida. Tr. 52-53. Dr. Shafrir is currently in private practice. Tr. 53-54. He has had various academic appointments and has worked as a pediatric neurologist at numerous hospitals. Pet. Ex. 133 at 3. He has published peer-reviewed journal articles and abstracts on the topics of pediatric neurology, epilepsy, and epileptic syndromes. Tr. 53-54; Pet. Ex. 133 at 5-8.

Dr. Shafrir is not board certified in immunology and has never been employed as a practicing immunologist. Tr. 121. He has not published peer-reviewed articles related to the principles of immunology discussed in his testimony, including molecular mimicry. Tr. 122.

### b.    Opinion[22]

#### i.    Diagnosis

Dr. Shafrir opined that K.H.'s diagnosis is "autoimmune encephalopathy." Tr. 57. He defined encephalopathy as "the brain not working right," and gave an example of "a patient with high fever" that is "poorly responsive." Id. He stated that the word encephalopathy is "nonspecific" and can present as "seizures, loss of consciousness, coma, and in many other ways." Id.

According to Dr. Shafrir, K.H. was "clinically encephalopathic" as characterized by his mother's testimony; K.H. was not tracking, not fixating, and he developed "other sequalae of his encephalopathy, and finally develop[ed] autism."[23] Tr. 58. When asked what differentiated K.H.'s encephalopathy from his infantile spasms, Dr. Shafrir opined that K.H. "had a long period of encephalopathy prior to the onset of [] spasm[s]." Tr. 59. Next, he opined that K.H.'s EEG showed infantile spasms and a focal seizure that required "super maximum" prednisone doses to control his seizures. Id. Additionally, K.H.'s EEG never normalized, and he did not improve after "cessation of the seizure[s]" which is usually seen when the "spasms are under control." Id. Dr. Shafrir acknowledged, however, that "none of [these] differences are clear-cut." Tr. 60.

Infantile spasms were defined by Dr. Shafrir as an epileptic syndrome that presents with a triad: (1) the EEG is "very striking," (2) the seizure is a "cluster of sudden brief stiffening of the body[] [and] arms" that usually occurs when a child is waking from or going to sleep, and (3) it is associated with "a development of regression." Tr. 60. There are two types of infantile spasms, symptomatic and cryptogenic. Id. Symptomatic infantile spasms have a known cause or genetic cause, while cryptogenic infantile spasms occur in a child that was previously normal and no cause is identified. Tr. 60-61.

---

[22] For the sake of brevity and clarity, the undersigned does not summarize all of Dr. Shafrir's opinions or testimony and attempts to limit this Decision to the most material and relevant opinions.

[23] Dr. Shafrir disagreed with Dr. Zempel and opined that an infant who does not look at his mother (or who stops looking at his mother) is displaying encephalopathy. Tr. 363.

Dr. Shafrir testified that K.H.'s vaccinations, primarily the DTaP vaccination on April 7, 2017, caused his infantile spasms.  Tr. 61.  According to Dr. Shafrir, K.H.'s work-up did not reveal any other cause.  Tr. 62.  Regarding his diagnosis of autism, Dr. Shafrir opined that the autism diagnosis is a result of K.H.'s infantile spasms.  Id.  He explained that 15-20% of patients with infantile spasms will develop autism.  Id. (citing Pet. Ex. 26 at 11 (noting autism was reported in 19.9% of subjects with infantile spasms);[24] Pet. Ex. 95 at 3 (reporting "evolution to autism is seen in 15%" of infants with infantile spasms)).[25]  Here, "[K.H.'s] autism is not [an] independent process" but part of his infantile spasm.  Id.  And the diagnosis of autism does not change Dr. Shafrir's opinion as to K.H.'s diagnosis.  Id.

### ii.    <u>Althen</u> Prong One

Dr. Shafrir opined the vaccinations[26] administered in April and August 2017 "caused [] brain inflammation, causing encephalopathy, causing infantile spasm."  Tr. 98.  He advanced a broad mechanism of "activation and autoimmune reaction of both innate and adaptive components of the immune system" to explain how vaccinations can cause encephalopathy in infants.  Pet. Ex. 24 at 69.  In his first expert report, he opined "[t]here is a good amount of epidemiological evidence to suggest a causal relationship between pertussis vaccination and childhood encephalopathy," and offered two references in support: the National Childhood Encephalopathy Study ("NCES")[27] and the Vaccine Injury Table.  Id. at 61, 69 (citing Pet. Exs. 48, 52).

The NCES was formed in 1976 due to concerns about the whole cell pertussis vaccine, and the study was undertaken by a working group in consultation with organizations in the United Kingdom, including the British Paediatric Association, to investigate neurological conditions associated with vaccinations.  Pet. Ex. 52 at 19; Tr. 72.  The study included 1,000 children with serious neurological disorders.  Pet. Ex. 52 at 19.  Thirty-five cases (3.5%) and 34

---

[24] Piero Pavone et al., <u>West Syndrome: A Comprehensive Review</u>, 41 Neurol. Scis. 3547 (2020).

[25] Oleksii Sandra et al., <u>Inflammation in Epileptic Encephalopathies</u>, 108 Advs. Protein Chem. & Struct. Biol. 59 (2017).

[26] Dr. Shafrir sometimes referred generally to the vaccines or vaccinations, and alternatively discussed diphtheria-tetanus-pertussis ("DTP" or "DPT") and/or DTaP.  Given this inconsistency, the undersigned's Decision presumes that Petitioner does not limit her claims to the DTaP vaccination but assumes that any or all of the vaccinations administered on April 7 and August 1, 2017 are at issue herein.

[27] R. Alderslade et al., <u>Report of the National Childhood Encephalopathy Study</u>, <u>in</u> Whooping Cough: Reports from the Committee on Safety of Medicines and the Joint Committee on Vaccination and Immunisation 79 (1981).

controls (1.7%) received DTP[28] within seven days of onset.  Pet. Ex. 52 at 28.  There was "a statistically significant increased risk of having received DTP vaccine within [seven] days before [] onset," with the risk greatest within the first 72 hours after vaccination and for cases of convulsions or encephalopathy.  Id. at 44.  "Of the 35 DTP vaccine-associated cases[,] . . . [t]here were only nine cases . . . in which no alternative explanation for their condition was found."  Id. The study concluded that the "DTP vaccine probably can cause acute neurological reactions," but that these were very rare events.  Id. at 39.  The acellular form of the pertussis vaccine given to K.H. (DTaP) was not studied.  The authors did not provide any conclusions regarding a causal mechanism.

In his second expert report, Dr. Shafrir seemed to discount the findings of the NCES study, stating that "epidemiological studies are not appropriate for concluding causation here." Pet. Ex. 78 at 8.  Dr. Shafrir explained that "because [K.H.'s] infantile spasms started only one month after [] vaccination[,] [] his encephalopathy was not severe enough to require hospitalization[] [and] he would not have been included in the NCES as a vaccine related case." Id. at 8-9.

At the hearing, when discussing the NCES, Dr. Shafrir agreed that DTaP, the acellular form of pertussis vaccination at issue in the study, as compared to DTP, the whole cell pertussis vaccine, causes "much less fever, much less febrile seizures, and much less irritability."  Tr. 73. But for severe reactions, Dr. Shafrir asserted "there were no good comparison[s] because you need to have a very large number of patients to see encephalopathy."  Id.  He opined that the DTaP vaccine caused about the same rate of encephalopathy as the DTP vaccine and cited additional papers for support.  Tr. 73-75 (citing Pet. Ex. 90;[29] Pet. Ex. 91).[30]

Zieliński and Rosińska conducted a passive reporting study in Poland comparing the whole cell and acellular pertussis vaccines from 2001 to 2005 in children under the age of two. Pet. Ex. 90 at 1.  They found that children younger than age two had "about twice as high incidence of adverse effects following the whole-cell than the acellular vaccine," although there was "no significant difference in incidence of the most severe reactions, including encephalopathy and nonfebrile seizures."[31]  Id.  Specifically for acute encephalopathy in children

---

[28] For more information on the difference between the DTP (whole cell pertussis) vaccine and the DTaP (acellular pertussis) vaccine, which was given to K.H., see Nicola P. Klein, Licensed Pertussis Vaccines in the United States, 10 Hum. Vaccin. Immunother. 2684 (2014), https://pmc.ncbi.nlm.nih.gov/articles/PMC4975064/.

[29] Andrzej Zieliński & Magdelena Rosińska, Comparison of Adverse Effects Following Immunization with Vaccine Containing Whole-Cell vs. Acellular Pertussis Components, 62 Przegl. Epidemiol. 589 (2008).

[30] Jana Danova et al., Active Surveillance Study of Adverse Events Following Immunisation of Children in the Czeck Republic, 17 BMC Pub. Health 1 (2017).

[31] An estimated 7,037,929 doses of whole cell pertussis and 1,334,143 doses of acellular pertussis were given to children below the age of two.  Pet. Ex. 90 at 4 tbl. II.

younger than two, 11 received the whole cell pertussis vaccine and two received the acellular version. Id. at 3 tbl. I. Regarding first episode of afebrile seizures in children under two, there were 37 episodes after the whole cell vaccine and three after the acellular vaccine. Id. The authors observed that "[a]cute encephalopathy occurred very rarely in either group. It was reported only in two cases following acellular vaccine . . . . [I]t is so rarely reported[] that its occurrence seems to require some other special predisposing factors . . . ." Id. at 6.

Danova et al. examined adverse events following vaccination in children aged zero to 10 in the Czech Republic from 2011 to 2013. Pet. Ex. 91 at 1. Of the pertussis-containing vaccines administered, all were the acellular version. Id. at 2 tbl. 1, 3 tbl. 2. Encephalopathy was reported in 2.2% of children, but this was not broken down into age groups or by vaccination. Id. at 3, 3 tbl. 3. Neither of the studies discussed the causal mechanism of encephalopathy after vaccination.

The second basis for Dr. Shafrir's causation opinion is that "DTaP is recognized as a cause of encephalopathy by the [V]accine [] [I]njury [T]able," which "recognizes encephalopathy occurring within 72 hours after vaccination[s] containing specific pertussis antigens" as a "table injury." Pet. Ex. 116 at 6; Pet. Ex. 24 at 59. The Vaccine Injury Table provides that for vaccines containing whole cell pertussis bacteria (DTP), or extracted or partial cell pertussis, or specific pertussis antigens (including DTaP), the condition of encephalopathy occurring within 72 hours of vaccination is a covered condition (table injury) if the injury meets the Table description of encephalopathy (acute or chronic). Pet. Ex. 48 at 1, 4. The Table defines acute encephalopathy (without a seizure) as "a significantly decreased level of consciousness that lasts at least 24 hours"[32] in children "less than 18 months of age." Id. at 4. If this description is met, and there are no exclusionary conditions or alternative causes, there is a presumption in favor of entitlement to compensation. Id. at 5; Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1319-20 (Fed. Cir. 2006). The Table does not identify or discuss causal mechanisms whereby the DTaP vaccine can cause encephalopathy.

In his expert reports, and at the hearing, Dr. Shafrir often stated that the DTaP vaccination can cause encephalopathy. When asked to explain how, he stated, "[t]he only way that this encephalopathy can be brought about is through an auto inflammatory mechanism." Pet. Ex. 78 at 3; see also Pet. Ex. 24 at 65-69; Tr. 63-64, 118 ("The vaccine produced a brain inflammation, and through the mechanism of activation of the innate immune system and later the adaptive immune system, and then this inflammation caused encephalopathy, and the encephalopathy progressed and culminated in the infantile spasms."). Dr. Shafrir explained that "the exact mechanism by which DTaP causes encephalopathy . . . has never been elucidated." Pet. Ex. 78 at 4; see also Pet. Ex. 24 at 66 (acknowledging "an exact description of the mechanism by which the DPT vaccination [] causes . . . encephalopathy[] cannot be described with accurate details"). Although "the exact mechanism . . . is completely unknown," Dr. Shafrir

---

[32] The Vaccine Injury Table's Qualifications and Aids to Interpretation explain that "[t]he following clinical features in themselves do not demonstrate an acute encephalopathy or a significant change in either mental status or level of consciousness: Sleepiness, irritability (fussiness), high-pitched and unusual screaming, poor feeding, persistent inconsolable crying, bulging fontanelle, or symptoms of dementia." Pet. Ex. 48 at 5.

stated, "[i]t is assumed . . . [to be] a result of environmental insult such as infection or immunization in genetically susceptible individuals."  Pet. Ex. 78 at 4.

In support of his opinion related to brain inflammation, Dr. Shafrir cited several papers. Referencing Lassmann et al.,[33] Dr. Shafrir stated it showed that mice which were genetically engineered to have a mutation in their immune system developed symptomatic brain inflammation after they were given pertussis toxin peripherally.  Tr. 64-65 (citing Pet. Ex. 57). However, a review of the study shows it was intended to study the mechanisms of multiple sclerosis, induced in a mice model known as experimental autoimmune encephalomyelitis ("EAE"), not encephalopathy or seizures.  Pet. Ex. 57 at 1.  These EAE models "require potent adjuvants," including complete Freud's adjuvant (made with *Mycobacterium* or bacterial DNA) combined with pertussis toxin, to stimulate cytokine production and disrupt the blood brain barrier.  Id.  Similarly, in Stojković et al.,[34] mice were induced to develop EAE using complete Freund's adjuvant with the *Bordetella pertussis* vaccine injected intraperitoneally, not intramuscularly, along with a peripheral injection of the pertussis vaccine.  Pet. Ex. 58 at 1-2. According to Dr. Shafrir, these two experiments demonstrate that "peripherally injected pertussis vaccine [can] enhance brain inflammation."  Tr. 65.  Dr. Shafrir conceded that the mice used in the experiment were "not normal," but he compared the genetically engineered mice in the study to children who "probably" have a "genetic propensity to . . . develop[] this reaction."  Tr. 65-66. Neither study used methodology that simulated vaccination.

Next, Dr. Shafrir referenced articles purporting to support the "general principal that a peripheral inflammation can affect the brain directly."  Tr. 67 (citing Pet. Ex. 30).[35]  Vitaliti et al. provided a literature review of the involvement of the immune system in the development of early onset epileptic encephalopathy, noting that studies have shown that "inflammation may be involved" and that "a number of inflammatory markers" have been suggested.  Pet. Ex. 30 at 1-2. The paper discussed numerous theories and recommended further research to identify biomarkers to aid in the identification of immune system involvement and treatment.  Id. at 2-7. The authors did not, however, conclude that a peripherally administered vaccination could induce brain inflammation.  Vaccines were not discussed.

Shandra et al. discussed the inflammatory processes that take place in epileptic encephalopathy, particularly infantile spasms, seen in laboratory animals.  Tr. 67-68 (citing Pet.

---

[33] Silke Lassmann et al., Induction of Type 1 Immune Pathology in the Brain Following Immunization Without Central Nervous System Autoantigen in Transgenic Mice with Astrocyte-Targeted Expression of IL-12, 167 J. Immunol. 5485 (2001).

[34] Aleksandra Stojković et al., Pertussis Vaccine-Induced Experimental Autoimmune Encephalomyelitis in Mice, 5 Transl. Neurosci. 57 (2014).

[35] Giovanna Vitaliti et al., Molecular Mechanism Involved in the Pathogenesis of Early-Onset Epileptic Encephalopathy, 12 Front. Mol. Neurosci. 1 (2019).

Ex. 95). The animal model of infantile spasms is induced by injection of lipopolysaccharide[36] into the cortex of the brain in mice, which causes an epileptic syndrome similar to infantile spasms. Tr. 68 (citing Pet. Ex. 95 at 12-13). Dr. Shafrir stated that this is the primary model that shows how inflammatory processes in the brain cause infantile spasm, although there are other modalities to induce the illness in mice. Tr. 68-69. Shandra et al. discussed West syndrome, an epileptic encephalopathy syndrome characterized by infantile spasms, hypsarrhythmia, and "poor neurodevelopmental outcomes." Pet. Ex. 95 at 1. The cause is structural, metabolic, genetic, or unknown. Id. Genetic research has uncovered genetic involvement, including at least 60 known genes. Id. at 7. The authors noted that "seizures may also activate proinflammatory pathways raising the possibility that inflammation can be a consequence of seizures and epileptic processes." Id. at 1. The authors concluded that "[t]he full spectrum of inflammatory mediators in epileptic encephalopathies, like [infantile spasms], needs to be more fully investigated." Id. at 15.

Additional papers relied on by Dr. Shafrir to support his opinion that vaccine-induced inflammation causes infantile spasms include one authored by Pavone et al. Tr. 78-79 (citing Pet. Ex. 26). Dr. Shafrir explained that Pavone et al. identified genetic factors and autoimmune cerebellar folate deficiency which make children prone to developing infantile spasms. Tr. 80. The authors stressed that adrenocorticotropic hormone ("ACTH") and steroids are anti-inflammatory treatments, which Dr. Shafrir explained is why the treatments are effective for infantile spasms. Id. (citing Pet. Ex. 26 at 9); see also Tr. 81-83 (citing Pet. Ex. 31;[37] Pet. Ex. 39);[38] Tr. 84 (describing "two multi-hit models" and genes associated with regulation of neuroinflammatory pathways) (citing Pet. Ex. 95); Pet. Ex. 29 at 1 ("Therapy with ACTH and corticosteroids are the most effective.").[39] Dr. Shafrir opined that "[t]he most obvious evidence for the role of the immune system [in] infantile spasms is that a treatment of choice is immunosuppressive therapy. ACTH is the treatment of choice." Pet. Ex. 24 at 63. But see Pet. Ex. 30 at 4 ("ACTH, the immunosuppressor, is included in the first-line treatment for [infantile spasms], even though its therapeutic mechanism remains unknown."). Yet, he cited articles that found immunosuppressive treatment with intravenous immunoglobulins ("IVIG") can lead to "disappointing" results. See Tr. 207-09 (citing Pet. Ex. 32 (examining the relationship between

---

[36] "[Lipopolysaccharide] is a prototypical inducer of inflammation in both periphery and in the brain, known to lower seizure threshold when added with proconvulsant compounds and worsen seizure sequelae." Pet. Ex. 95 at 12.

[37] Alessandro Orsini et al., The Role of Inflammatory Mediators in Epilepsy: Focus on Developmental and Epileptic Encephalopathies and Therapeutic Implications, 172 Epilepsy Rsch. 1 (2021). This article was also cited as Pet. Ex. 96.

[38] Pinar Tekturk et al., Investigation of Neuronal Auto-Antibodies in Children Diagnosed with Epileptic Encephalopathy of Unknown Cause, 40 Brain & Dev. 909 (2018).

[39] Terezinha de Cresci Braga Montelli & M.T.S. Peraçoli, Infantile Epileptic Encephalopathy with Hypsarrhythmia (Infantile Spasms/West Syndrome) and Immunity, 8 Cent. Nervous Sys. Med. Chem. 92 (2008).

IVIG and infantile spasms and finding the "therapeutic results were disappointing");[40] Pet. Ex. 34 (concluding "[t]he efficacy of IVIG was so low that it should not be considered as first-line treatment in West syndrome")).[41]

Turning to cytokines, Dr. Shafrir referenced Orsini et al.  Pet. Ex. 31.  Dr. Shafrir testified that the study showed abnormalities in cytokine metabolism in children with infantile spasms and that treatment with ACTH decreased the inflammatory reaction of cytokines.  Tr. 69 (citing Pet. Ex. 31).  Orsini et al. focused on developmental and epileptic encephalopathies ("DEE").  Pet. Ex. 31 at 1.  In discussing West syndrome, the authors noted that while inflammation may play a causal role in West syndrome, they could not exclude that the inflammatory alterations discussed "may be concomitant, rather than causal, and be the expression of an underlying brain-damaging process. . . .  Further research[] will better clarify the actual role of inflammation in the genesis of [West syndrome] and the precise therapeutic mechanism of ACTH and steroids in the treatment of DEE."  Id. at 5; see also Pet. Ex. 30 at 4.  Similarly, Dr. Shafrir also referred to an article authored by de Cresci Braga Montelli and Peraçoli to describe the role of cytokines in these patients as well as inflammatory mechanisms in infantile spasms.  Tr. 69-70 (citing Pet. Ex. 29).  As to cytokines specifically, the authors noted studies have "suggest[ed] the importance of cytokines in the pathophysiology of seizure[] disorders."  Pet. Ex. 29 at 3.

Next, Dr. Shafrir cited papers discussing cytokines that purportedly supported the idea that "brain inflammation can [] be induced by . . . peripheral injection of the pertussis toxin."  Tr. 70.  Dr. Shafrir cited Vitaliti et al. to show "cytokines go rogue in inflammation . . . lead[ing] to infantile spasms."  Tr. 80 (citing Pet. Ex. 30).  As noted above, Vitaliti et al. discussed the molecular mechanisms of epileptic encephalopathy and neurologic inflammation; the authors did not suggest that vaccination induces this process.  Pet. Ex. 30.  Matin et al.[42] discussed inflammation in epilepsy and provided a model of inflammatory epileptogenesis.  Pet. Ex. 67 at 1, 5 fig. 1.  The authors reviewed five immunotherapeutic studies aimed at blocking the effects of inflammation, but these animal experiments do not simulate the DTaP vaccination.  See id. at 7 tbl. 1.  The paper does not suggest that vaccination causes cytokine-induced encephalopathy or infantile spasms.

---

[40] Bernard Echenne et al., Treatment of Infantile Spasms with Intravenous Gamma-Globulins, 13 Brain & Dev. 313 (1991).

[41] Ryuki Matsuura et al., Intravenous Immunoglobulin Therapy Is Rarely Effective as the Initial Treatment in West Syndrome: A Retrospective Study of 70 Patients, 368 J. Neurolog. Scis. 140 (2016).

[42] Nassim Matin et al., Epilepsy and Innate Immune System: A Possible Immunogenic Predisposition and Related Therapeutic Implications, 11 Hum. Vaccin. & Immunother. 2021 (2015).

Moving to Kashiwagi et al.,[43] the authors looked at cytokine profiles in peripheral blood mononuclear cells ("PBMCs") after three vaccines, DPT, Hib, and the pneumococcal 7-valent vaccine ("PCV7"). Pet. Ex. 69 at 1. Cytokines were produced as early as six hours after vaccination and increased until 24 hours after vaccination, but no finding of sustained elevation was reported. Id. at 4. Different combinations of the vaccines induced febrile reactions. Id. at 5 tbl. 1. For example, vaccination with DPT/Hib/PCV7 together showed the highest rates of fever (22 patients) within 24 hours of vaccination. Id. Seizures/spasms were not discussed as an adverse effect (although it does not appear they were studied). See id. at 1-9. The study did not provide evidence that cytokines would remain elevated after 24 hours. See id. at 4. Further, the study does not support the idea that vaccination-induced cytokines can cause neuroinflammation, encephalopathy, or infantile spasms.

Blood-Siegfried et al.[44] showed that whole-cell pertussis in the DTP vaccine can produce symptoms like those that occur in response to cytokines IL-6, IL-1β, and TNFα. Pet. Ex. 70 at 1. They found that the whole-cell pertussis vaccine "induced significantly" more of these cytokines than the acellular pertussis vaccine *in vitro*. Id. The authors concluded that "DTaP vaccines, which are known to cause minimal symptomatology, stimulated much lower levels of these cytokines." Id. at 6. DTaP was able to "stimulate low, but clearly detectable levels of IL-6," which the authors noted "suggests that some endotoxin-independent mechanism may be contributing to the induction of IL-6 production." Id. However, this was not seen in a model described (monocytic THP-1) and thus, additional studies were recommended to determine the role of pertussis toxin in the induction of cytokine responses. Id. The study did not provide foundational evidence to suggest that DTaP vaccination could lead to neuroinflammation or cause infantile spasms.

Regarding the adaptive immune system, Dr. Shafrir opined "[t]here is strong evidence in the literature that at least some cases of infantile spasms are autoimmune in nature." Pet. Ex. 116 at 6; see also Tr. 94. He explained that the adaptive immune system is responsible for antigen-specific immunity, usually produced by cytotoxic T lymphocytes or T cells and B cells that produce antibodies. Tr. 94. The production of autoantibodies is "genetically controlled." Id. When an antibody is "active against a component of the body," it is called an autoantibody, and these can cause autoimmune illnesses. Tr. 95. Dr. Shafrir discussed the role played by molecular mimicry in vaccine reactions. Id. He testified that here, he "presumed" there was "production of autoantibodies" to "components of the DPT vaccination[] and . . . protein in the brain," which occurred "in relation to vaccine administration." Tr. 96. He further opined that there are "[h]omologies between components of the DTaP vaccine and many brain proteins [that] may serve as a basis for molecular mimicry and autoimmunity." Pet. Ex. 116 at 6. He based this on the finding of autoantibodies in "early-onset cases of epileptic encephalopathy" implicating

---

[43] Yasuyo Kashiwagi et al., Production of Inflammatory Cytokines in Response to Diphtheria-Pertussis-Tetanus (DPT), *Haemophilus Influenzae* Type B (Hib), and 7-Valent Pneumococcal (PCV7) Vaccines, 10 Hum. Vaccin. & Immunother. 677 (2014).

[44] Jane Blood-Siegfried et al., Monokine Production Following *in Vitro* Stimulation of the THP-1 Human Monocytic Cell Line with Pertussis Vaccine Components, 18 J. Clin. Immunol. 81 (1998).

an autoimmune etiology for infantile spasms.  Tr. 82 (citing Pet. Ex. 39).  Tekturk et al. reported that 14% (7/50) of patients with epileptic encephalopathy (of unknown cause) had neuronal autoantibodies, and three of these patients had infantile spasms.  Id. (citing Pet. Ex. 39 at 1, 6 tbl. 1b).  Thus, Dr. Shafrir concluded that "there is a role [for] [] autoantibodies in the pathogenesis of infantile spasms."  Tr. 83.

Another reason for his opinion that some cases of infantile spasms are autoimmune is based on a case report showing "resolution of infantile spasms with rituximab treatment."[45]  Pet. Ex. 116 at 6 (citing Pet. Ex. 83).[46]  Kawano et al. described the case of a three-month-old child who had autoimmune encephalitis as the clinical manifestation of a "rare autosomal recessive disorder caused by a mutation in the autoimmune regulator gene."  Pet. Ex. 83 at 1.  The genetic disorder is "autoimmune polyendocrinopathy-candidiasis-ectodermal dystrophy (APECED)."  Id.  The clinical course of the infant was far different than that of K.H.  Specifically, the infant presented with autoimmune encephalitis, whereas here, K.H. was not diagnosed with or treated for autoimmune encephalitis.  Id.  The authors concluded that "despite the limited ability to extrapolate findings from a single case," the positive response to rituximab in a "rare case of an infant with [infantile spasms]/[West syndrome] may suggest that B and T cells play a crucial role in the underlying [] [causal] mechanisms.  Id. at 6.

---

[45] Dr. Shafrir defined Rituximab as "a monoclonal antibody treatment that kill . . . CD-20 cells that produce antibodies."  Tr. 85.

[46] Go Kawano et al., Case Report: Rituximab Improved Epileptic Spasms and EEG Abnormalities in an Infant with West Syndrome and Anti-NMDAR Encephalitis Associated with APECED, 12 Front. Neurol. 1 (2021).  Dr. Shafrir cited additional articles in support of his opinion that infantile spasms are autoimmune in etiology (associated with antineuronal autoantibodies).  See, e.g., Pet. Ex. 84 (Jehan Suleiman et al., Immune-Mediated Steroid-Responsive Epileptic Spasms and Epileptic Encephalopathy Associated with VGKC-Complex Antibodies, 53 Dev. Med. & Child Neurol. 1058 (2011)) (describing a case of an infant with epileptic spasms and developmental delay who had oligoclonal bands in her CSF, prompting testing for autoantibodies, which showed elevated voltage-gated potassium-channel complex proteins ("VGKC-complex antibodies"), and the infant had a "partial response" to steroid treatment); Pet. Ex. 85 (I. Málaga et al., Infantile Spasms in an Infant with Anti-NMDA Receptor Encephalitis Secondary to HSV-1 Encephalitis, 19S Eur. J. Paediatric Neurol. S82 (2015)) (describing an infant with post-herpes simplex encephalitis who had NMDAR antibodies (evidence of anti-NMDA receptor encephalitis)); Pet. Ex. 86 (Valentina Stephen Joseph et al., Epileptic Spasms and Neurodevelopmental Regression: A Rare Presentation of Anti-NMDA-Receptor Encephalitis, 98 Neurology 3303 (2022)) (reporting a case of an infant with anti-NMDA receptor encephalitis and infantile spasms who received "aggressive treatment"); Pet. Ex. 87 (Tatsuo Mori et al., Antibodies Against Peptides of NMDA-Type GluR in Cerebrospinal Fluid of Patients with Epileptic Spasms, 20 Eur. J. of Paediatric Neurol. 865 (2016)) (examining the effects of antibodies against NMDA-type glutamate receptor in CSF on clinical features of those with epileptic spasms).  K.H. was not diagnosed with autoimmune encephalitis and there is no evidence of antineuronal autoantibodies.

On cross-examination, Dr. Shafrir testified that "molecular mimicry supports the possibility of . . . [an] autoimmune reaction." Tr. 168. He offered examples of homologies, referencing the Kanduc articles.[47] Tr. 170-71. When further questioned, he opined there was "homology between the tetanus toxin, which is part of the vaccine [K.H.] received and brain protein." Tr. 174, 176-77. He also testified that the diphtheria toxin is also in the vaccine. Tr. 178. Dr. Shafrir clarified that in vaccines, these toxins are purified and treated so that they are not active toxins, but they are the same protein. Id. Dr. Shafrir conceded, however, there was no evidence that molecular mimicry occurred here, instead noting it was "a potential mechanism." Tr. 179.

Next, Dr. Shafrir discussed "epileptogenesis," or "the process that occurs between the injury and the appearance of the seizure." Tr. 76. Typically, seizures are caused by "brain trauma or head trauma, stroke, and status epilepticus []or another reason." Id. There is a period of time between injury and first seizure. Id. For example, in stroke and head trauma, there can be a period of two weeks before seizure, whereas in infection, there may be a shorter period of time before seizure. Tr. 76-77. According to Dr. Shafrir, "all symptomatic infantile spasms are the result of encephalopathy." Tr. 77. However, "encephalopathy doesn't cause infantile spasm immediately at the time of a brain injury, but sometime later." Id.; see also Pet. Ex. 116 at 2 (citing Pet. Ex. 120).[48] Regarding this latency period, Dr. Shafrir explained "the cause of the onset of infantile spasm in a particular point in time is completely unclear and may be related to inflammatory and immune factors." Pet. Ex. 116 at 6 (citing Pet. Exs. 31, 95); see also Pet. Ex. 125 (describing the multi-hit model of the development of epileptic encephalopathy).[49]

---

[47] See Pet. Ex. 63 (Darja Kanduc, Peptide Cross-Reactivity: The Original Sin of Vaccines, S4 Front. Biosci. 1393 (2012)) (discussing generally cross-reactivity and vaccines); Pet. Ex. 64 (Guglielmo Lucchese et al., The Peptide Network Between Tetanus Toxin and Human Proteins Associated with Epilepsy, 2014 Epilepsy Rsch. & Treatment 1) (showing data that suggested a "potential for cross-reactivity between the [Clostridium tetani] neurotoxin and specific epilepsy-associated proteins" which "may help evaluate the potential risk for epilepsy following immune responses induced by tetanus infection"); Pet. Ex. 65 (Simona Lucia Bavaro et al., Pentapeptide Sharing Between Corynebacterium Diphtheria Toxin and the Human Neural Protein Network, 33 Immunopharmacol. & Immunotoxicol. 360 (2011)) (showing peptide homology between Corynebacterium diphtheria toxin and human proteins "associated with fundamental neural functions"); Pet. Ex. 66 (Giovanni Capone & Darja Kanduc, Peptide Sharing Between Bordetella Pertussis Proteome and Human Sudden Death Proteins: A Hypothesis for a Causal Link, 8 Future Microbiol. 1039 (2013)) (examining peptide sharing between Bordetella pertussis and human proteins associated with sudden death).

[48] Mary Anne Guggenheim et al., Time Interval from a Brain Insult to the Onset of Infantile Spasms, 38 Pediatr. Neurol. 34 (2008).

[49] Wolfgang Löscher et al., The Enigma of the Latent Period in the Development of Symptomatic Acquired Epilepsy—Traditional View Versus New Concepts, 52 Epilepsy & Behav. 78 (2015).

In summary, Dr. Shafrir opined that his medical theory of causation is that the DTaP vaccine caused brain inflammation via the innate immune system and later the adaptive immune system, and the "inflammation caused encephalopathy, and the encephalopathy progressed and culminated in the infantile spasms." Tr. 118.

Dr. Shafrir agreed that none of the articles he cited show that the DTaP vaccine can cause encephalopathy which causes infantile spasms, or the sequence of events he discusses. Tr. 204.

### iii.    **Althen Prong Two**

Dr. Shafrir opined that there is a logical sequence of cause and effect here because in rare patients who have a "susceptibility that we do not understand," and in a "complex way," "through directed transfer of [] cytokines or the cytokines activate an inflammatory situation inside the blood-brain barrier," the "innate immune system [] is able to produce brain inflammation, and this is enhanced by the adaptive immune system with the potential of autoantibodies . . . possibly as a result of molecular mimicry." Tr. 118-19.

Dr. Shafrir emphasized that K.H.'s April 7, 2017 vaccinations did not cause his infantile spasms, but they caused encephalopathy, which later caused his infantile spasms. Tr. 363.

According to Dr. Shafrir, the vaccines "caused brain inflammation through the normal process" occurring after vaccination, but "unfortunately, for reasons that we don't know—probably [] genetic—[K.H. is] more susceptible to this over-reaction . . . , and this has affected his brain, and as a result of the brain inflammation, and later as a result of probable production of autoantibodies, he developed an encephalopathy and then developed epilepsy," or infantile spasms. Tr. 63-64. Since "the inflammation perpetuate[s] the encephalopathy, he developed . . . infantile spasms." Tr. 64. Dr. Shafrir held this opinion to a "reasonably degree of medical certainty." Tr. 98.

One of the reasons Dr. Shafrir believed K.H.'s infantile spasms were autoimmune is that the medical literature he cited showed that autoimmune treatments are effective for infantile spasms. Tr. 364-65 (citing Pet. Ex. 95). Further, he opined that ACTH and steroids are "immunosuppressant and antiinflammatory" and the fact that they are good treatments for infantile spasms is "highly suggestive that inflammation, whether secondary or primary, plays a major role in infantile spasm." Tr. 367.

As evidence that K.H.'s infantile spasms were autoimmune in nature, Dr. Shafrir relied on the lack of other causes and the "challenge/rechallenge situation." Tr. 87. He further explained that "brain inflammation" can "perpetuate itself and cause a progressive encephalopathy and lead[] to infantile spasms, and when [K.H.] start[ed] to improve, he had another vaccine that produced the same process, and he ended up getting infantile spasms again." Tr. 88. Dr. Shafrir argued that this alleged worsening constitutes evidence of "positive challenge/rechallenge," which he defined as an "adverse reaction in relation to a particular stimulus" that occurs when the exposure to the stimulus or medication is repeated. Tr. 96-97. He opined that a normal MRI does not rule out inflammation. Tr. 364.

28

K.H. received the first DTaP vaccination April 7, 2017. Tr. 99. Dr. Shafrir testified that based on the medical records and Petitioner's testimony, onset of K.H.'s first seizure was April 30, 2017, 23 days after vaccination. Tr. 100. He was diagnosed with infantile spasms and was successfully treated with steroids. Tr. 100-01. Based on medical records dated June 12, 2017, Dr. Shafrir opined that the seizures had stopped, and Petitioner reported that K.H. had improved developmentally, had better tracking, and less irritability. Tr. 101-02. On July 14, Petitioner emailed Dr. McCaul stating K.H.'s spasms had stopped, and he was "catching up developmentally." Tr. 102 (quoting Pet. Ex. 10 at 621).

Before K.H.'s August 1, 2017 vaccinations, Dr. Shafrir agreed K.H. was "still significantly behind developmentally," but he was improving and tracking. Tr. 102-03 (citing Pet. Ex. 7 at 99-101). On August 15, Petitioner reported that K.H. was tracking inconsistently and Dr. McCaul documented K.H. "only appears to fixate on me briefly, does not track." Tr. 105 (quoting Pet. Ex. 9 at 669). Based on this note, Dr. Shafrir opined that K.H. developed encephalopathy sometime between August 1 and 15. Id. K.H. experienced a recurrence of his infantile spasms on September 1, 2017, 31 days after vaccination. Tr. 106. Dr. Shafrir testified that after both sets of vaccines, K.H. stopped tracking and interacting visually. Tr. 108.

According to Dr. Shafrir, the expected time frame for challenge/rechallenge to cause an adverse reaction upon re-exposure to a medication (or vaccination) is the "same time that it took the adverse reaction to appear after the stimulus the first time." Tr. 97-98. Here, after the first DTaP vaccination, K.H. had seizures within 23 days, and after the second set of vaccines, he developed infantile spasms in 31 days, which, according to Dr. Shafrir, was evidence of

29

challenge/rechallenge.[50]  Tr. 108.

Respondent's experts attributed the recurrence of spasms not to challenge/rechallenge but to discontinuation of steroids.  K.H. was given steroids until July 16, 2017, when he was weaned from them.  Tr. 111, 190.  Dr. Shafrir opined that K.H. was "still immunosuppressed" when the second vaccine was given, and so "the reaction was . . . probably [] not as fast and maybe not as dramatic" as after the first DTaP vaccination.  Tr. 111.  He explained that in the context of treatment for infantile spasms, it takes about three months after discontinuation of steroid treatment for the immune system to work properly.  Tr. 111-12; see also Pet. Ex. 116 at 3-4 (citing an article by Rajaraman et al. to show that the recurrence of infantile spasms after treatment is discontinued takes longer than what occurred in K.H.'s case, and that the time interval here supports challenge/rechallenge (citing Pet. Ex. 82 at 1, 4 (finding "44 relapses, occurring a median of 6.9 (3.2–10.8) months after initial response," and "time to relapse was not affected by treatment"))).[51]

Dr. Shafrir also disagreed with Respondent's experts' opinion that it is typical for infantile spasms to recur and in response, he opined that it was the encephalopathy (as opposed to infantile seizures) that returned, with the same symptoms.  Tr. 112.  In support, Dr. Shafrir cited Rajaraman et al., who found 44 relapses after the initial response in a range between 3.2 months and 10.8 months.  Tr. 112-13 (citing Pet. Ex. 82 at 1, 4).  Dr. Shafrir testified that K.H.'s

---

[50] According to Dr. Shafrir, the vaccine package insert provides a "clearcut contraindication" that the vaccine should not be given if a previous vaccine resulted in encephalopathy within seven days of vaccination.  Tr. 109, 367-68.  He also testified that K.H. should not have received the second set of vaccinations as it was "contraindicated" because K.H. had not been weaned off steroids for a month, but instead, he was only weaned for two weeks.  Tr. 197-98, 200.  Thus, Dr. Shafrir opined it was too soon to give the vaccines.  Tr. 111, 197-98, 200.

Of note, corticosteroids "have the potential to be immunosuppressive and are presumed to cause some degree of altered immunocompetence."  Altered Immunocompetence, Ctrs. for Disease Control & Prevention, June 26, 2024, https://www.cdc.gov/vaccines/hcp/imz-best-practices/altered-immunocompetence.html.  The Centers for Disease Control and Prevention ("CDC") provides guidance about administering live vaccines to those on long-term or high-dose steroids.  Id. (recommending "defer[ral] [of] live-virus vaccination for at least 1 month after discontinuation of high-dose systemically absorbed corticosteroid therapy administered for ≥ 14 days").  This is due, in part, to the fact that "[c]orticosteroids . . . can reduce the immune response to vaccines."  Id.  K.H.'s second set of vaccinations—Pediarix (DTaP, Hep B, IPV) and PCV13—were non-live vaccinations.  Timing and Spacing of Immunobiologics, Ctrs. for Disease Control & Prevention, July 24, 2024, https://www.cdc.gov/vaccines/hcp/imz-best-practices/timing-spacing-immunobiologics.html.  For the CDC's list of contraindications and precautions to commonly used vaccines, see Contraindications and Precautions, Ctrs. for Disease Control & Prevention, July 25, 2024, https://www.cdc.gov/vaccines/hcp/imz-best-practices/contraindications-precautions.html#cdc_report_pub_study_section_3-contraindications.

[51] Rajsekar R. Rajaraman et al., Prevention of Infantile Spasms Relapse: Zonisamide and Topiramate Provide No Benefit, 47 Epilepsia 1280 (2016).

seizures stopped and were under control by June 5, and K.H. had a recurrence approximately 2.5 months after discontinuation of treatment, which was a shorter period of time than described in the paper. Tr. 113-14 (citing Pet. Ex. 82 at 1, 4). He conceded this did not foreclose "the possibility" that K.H. would have had a "recurrence of encephalopathy with exactly the same symptoms" anyway. Tr. 113. However, Dr. Shafrir argued that if that was the scenario here, K.H. would not have been tracking "at all on August 15." Id.

Rajaraman et al., however, did not study the recurrence of encephalopathy after treatment for infantile seizures. See Pet. Ex. 82. Further, the paper clearly states that infantile spasm relapse is "common after initially successful treatment." Id. at 2. The conclusion of the study was that in those patients who did relapse and have recurrent infantile seizures, treatment with nonsteroidal agents (Zonisamde and topiramate) was not successful, and further study and guidelines were needed for prevention of recurrent infantile spasms. Id. The paper did not study vaccination or the impact of vaccination on the risk of relapse after vaccination. "The sole predictors of time to relapse were age at initial response in which older patients exhibited a lower risk of relapse . . . and response agent, in which patients whose initial response was attributed to surgical resection . . . exhibited a reduction in the risk of relapse . . . ." Id. at 4. Thus, Dr. Shafrir's reliance on this small study to suggest that vaccination caused K.H. to have an earlier relapse is unwarranted.

Respondent raised two alternative causes for K.H.'s infantile spasms. The first was that K.H.'s abnormal head shape may have indicated a preexisting neurological disorder. Tr. 114. Dr. Shafrir disagreed, explaining that an increase in abnormal head shape in infants occurred because of the "back-to sleep campaign" instituted to decrease the risk of sudden infant death syndrome. Tr. 114-15. He opined that although infants can have misshapen heads due to abnormalities in the structure of the skull, K.H. was checked for this and did not have it. Tr. 115.

On cross-examination, Dr. Shafrir was asked about K.H.'s medical records dated April 7, 2017, which documented "exaggerated plagiocephaly with mild asymmetry." Tr. 144-45 (citing Pet. Ex. 7 at 47). Dr. Shafrir explained that this condition is very common after infantile spasms begin. Tr. 145. He was asked about K.H.'s feeding difficulties, evidenced by a note dated April 7, 2017, and opined this was "completely normal" for a baby at that age. Tr. 147 (citing Pet. Ex. 7 at 47). Dr. Shafrir was also questioned about further notes depicting feeding difficulties in September 2017, April 2018, and November 2018. Tr. 149-52 (citing Pet. Ex. 7 at 119; Pet. Ex. 9 at 800; Pet. Ex. 10 at 885). Dr. Shafrir attributed this problem to K.H.'s encephalopathy and delay and opined this feeding problem was not the same as the problem noted in April 2017. Tr. 151-52. Ultimately, K.H. had a feeding tube placed due to these problems. Tr. 155.

As to the second alternative cause asserted by Respondent, that K.H. had a genetic etiology, Dr. Shafrir testified that extensive genetic testing was done and did not reveal the cause of K.H.'s infantile spasms. Tr. 115-16, 218. Dr. Shafrir agreed, however, that K.H. had a genetic predisposition that affected his immune system, "causing an autoreaction of the immune system in the way it produced his disease, and this must be related to a genetic factor." Tr. 219.

As for K.H.'s family history of seizures, Dr. Shafrir opined there was documentation of three different genetic syndromes in K.H.'s family: an aunt born with congenital anomalies and

31

seizures, an aunt with head trauma that caused seizure, and a father with a seizure for unknown reasons. Tr. 116, 191. He discussed each of these situations and initially concluded there was no relevance to K.H.'s condition. Tr. 116. On cross-examination, he seemed to agree that the family history may have increased the risk, but that it did not provide "great support for risk [of] epilepsy." Tr. 191. He further explained that "having a risk" does not equate to a cause for epilepsy. Id.

Dr. Shafrir also stated that K.H.'s autism diagnosis did not affect his opinion as to causation. Tr. 116. He opined that K.H.'s autism and infantile spasms were "caused by the same thing" and that autism was "part of the infantile spasm syndrome." Tr. 116-17.

Although Dr. Shafrir opined that K.H. has encephalopathy, and that he believes the basis for it is inflammatory, at the hearing he agreed that K.H. did not have autoimmune encephalitis. Tr. 156; Pet. Ex. 116 at 4. He agreed with Dr. Zempel that K.H. does not meet the criteria for autoimmune encephalitis. Tr. 156. Dr. Shafrir testified that K.H. has never had antibodies tested or an autoimmune encephalitis panel, and he did not have MRI changes or EEG changes consistent with the criteria of autoimmune encephalitis. Tr. 157. Dr. Shafrir agreed that encephalitis is inflammation of the brain whereas encephalopathy is defined as dysfunction of the brain. Tr. 157-58. He further opined that "autoimmune encephalopathy [conditions are] based on specific antibodies." Tr. 159. But see Pet. Ex. 116 at 4 ("The most important way to prove the autoimmune nature of autoimmune epilepsy is by its response to immunosuppressive treatment, as occurred in [K.H.'s] case.").

Dr. Shafrir explained that he "presumes" inflammation is the source of K.H.'s encephalopathy based on the "clinical picture," but there is no "spinal fluid or anything else to prove it." Tr. 160. His reasoning was "based on the fact that it was presumably caused initially by the vaccine, and then in a challenge/rechallenge was caused again by the vaccine." Tr. 161. He conceded, however, there is no "direct proof that [K.H.] had inflammation of the brain." Id.

Dr. Shafrir gave a similar answer when asked why he believed K.H.'s infantile spasms were autoimmune:

> The reason I believe it is autoimmune is because the only cause for the infantile spasm that was found was a vaccine, was preceded by encephalopathy, and was greatly supported by a challenge/rechallenge situation, and this is the only way for the vaccine to cause this, if autoimmune process, and this is the only proof that I have for autoimmunity.

Tr. 188.

Dr. Shafrir described K.H. as a "severely disabled child" who has motor abilities and is able to run, but lacks language and receptive abilities. Tr. 105-06. K.H.'s clinical course is seen in "some patients with infantile spasms," although seizure activity stops in some children as they get older. Tr. 106. Although K.H. is only on one seizure medication, his development has not improved. Id. Dr. Shafrir testified that most children with infantile spasms improve and do not have K.H.'s degree of developmental disability. Tr. 106-07.

#### iv.      **Althen** Prong Three

Regarding the timing of onset, Dr. Shafrir opined that K.H.'s onset was medically appropriate for an immune form of encephalopathy, citing the NCES study to support a period of seven days (Pet. Ex. 52 at 44), the Vaccine Injury Table to support a period of up to 72 hours (Pet. Ex. 48 at 1), and the package insert to support a time frame of seven days (Pet. Ex. 68 at 1, 4), though he testified the timing can be up to 15 days.  Tr. 109, 117; Pet. Ex. 24 at 59.  He also testified that appropriate timing can be up to 15 days.  Tr. 109.  It does not appear that Dr. Shafrir provided support for this statement.  See id.

In his first expert report, regarding onset of encephalopathy, Dr. Shafrir opined that K.H's "subacute encephalopathy" began "three weeks prior" to his hospital admission on May 1, 2017.  Pet. Ex. 24 at 55.  He opined that this placed onset on April 9, 2017, two days after his initial vaccinations on April 7.  Id.  He did not define "subacute encephalopathy" or distinguish it from "encephalopathy" as used in his reports or at the hearing.

At the hearing, however, Dr. Shafrir opined that K.H. "had a long period of encephalopathy prior to the onset of the spasm."  Tr. 59.  During this portion of his testimony, he did not define what he meant by a long period of time or otherwise quantify this timeframe.

Later during his rebuttal testimony at the hearing, Dr. Shafrir testified that onset of K.H.'s encephalopathy occurred within two weeks of the first set of vaccinations on April 7, 2017 when Petitioner observed that K.H. was not tracking, which would be approximately April 21, 2017.  Tr. 365.  Dr. Shafrir opined this timeframe was within the two-week time frame which Dr. Platt opined a vaccine reaction should occur.  Id.

Dr. Shafrir agreed that infantile spasms present in the first year of life.  Tr. 192.  He also agreed that K.H. had his first set of vaccinations on April 7, and his initial infantile spasms occurred April 30, 2017.  Id.  Further, he opined that K.H. received his second set of vaccines on August 1 and had a recurrence of spasms on September 1, 2017.  Tr. 193.  Dr. Shafrir acknowledged that K.H. responded well to steroids, and in the summer of 2017, K.H. had a steroid taper.  Tr. 193-95.  He agreed that "[w]eaning [K.H.] off of steroids seven weeks before could be a reason by itself [for the recurrence of spasms,] but we cannot ignore the similarity."  Pet. Ex. 24 at 58-59.

Dr. Shafrir also gave examples of herpes simplex virus autoimmune encephalitis, neonatal asphyxia, and cytomegalovirus infection where it may take "weeks to months" to develop infantile spasms.  Tr. 109-10.  He cited this evidence to support his opinion that the time frames here between vaccination and infantile spasm were appropriate.  Tr. 110.  Specifically, he opined that it was appropriate for a patient to develop "infantile spasms as a result of antibodies . . . within [a] few weeks."  Id.

On cross-examination, Dr. Shafrir disagreed that a cytokine response would occur within hours of vaccination.  Tr. 181.  Instead, he stated that "a cytokine response is a cascade, so one thing lead[s] to [an]other, lead[s] to [an]other, and it can happen in multiple days."  Id.  He

33

discussed the condition known as FIRES ("febrile illness in epilepsy syndrome"), which results in a continuous seizure.[52]  Tr. 181-82.  He stated that in general, "one process lead[s] to another, and the one cytokine can cause the accumulation of certain immune cells, and they secrete [] cytokine, and the cytokine go[es] to the blood-brain barrier, they produce inflammatory reaction on the other side of the blood-brain barrier by multiple mechanisms, and this can take days."  Tr. 182-83.

Lastly, Dr. Shafrir opined that the onset of encephalopathy occurred "at least two weeks before the beginning of the spasm."  Tr. 222.  He believed K.H.'s chronology supported his opinion that there were two separate situations (encephalopathy and infantile spasms).  Tr. 222-23.  On rebuttal, Dr. Shafrir emphasized that K.H.'s April 7, 2017 vaccinations did not cause his infantile spasms, but they caused encephalopathy.  Tr. 363.

### 2.    Respondent's Expert, Dr. John Zempel[53]

#### a.    Background and Qualifications

Dr. Zempel is a board-certified neurologist with special qualification in child neurology and epilepsy.  Resp. Ex. B at 1; Resp. Ex. H at 2.  He obtained his M.D. and Ph.D. at Washington University in Missouri.  Tr. 234; Resp. Ex. H at 1.  He completed an internship and residency in pediatrics, residencies in adult neurology and pediatric neurology, and fellowships in pediatric epilepsy and clinical neurophysiology.  Tr. 234; Resp. Ex. H at 1.  Since 2002, Dr. Zempel has held academic appointments at Washington University where he is currently a professor of neurology and pediatrics.  Tr. 234, 237; Resp. Ex. H at 2.  He also treats patients as "a pediatric neurologist and pediatric epileptologist, . . . clinically specializ[ing] in the care of children with intractable epilepsy."  Resp. Ex. B at 1; see also Tr. 235-36.  Dr. Zempel also actively treats children with infantile spasms.  Tr. 236; Resp. Ex. B at 2.  He "ha[s] published medical literature about the effects of electrographic seizures on neonates, and many papers on epilepsy," but "ha[s] not published medical literature on issues related to epilepsy and vaccines, or vaccines and any other issues."  Resp. Ex. B at 2.

#### b.    Opinion

#### i.    <u>Althen</u> Prong One

Dr. Zempel explained that the current name for the syndrome referred to as infantile spasms, which "comprises more than just seizures, is best called infantile epileptic spasm syndrome" or "IESS."  Tr. 242.  Specifically, an epileptic spasm is a type of seizure that lasts no longer than "tenths of seconds" and is characterized by "a sudden change in the patient's motor activity."  Tr. 243.  The activity may be flexion movements, a "kind of tighten up" movement, or extension-type movements, or the movements may be mixed.  Id.  On EEG, the spasms have a "definite electrographic signature" or appearance.  Id.  The EEG pattern may be present without

---

[52] There is no evidence to suggest that K.H. had FIRES or a continuous seizure.

[53] Dr. Zempel filed three expert reports.  Resp. Exs. B, D, F.

clinical signs of spasms.  Tr. 243-44.  However, if the EEG is done long enough, there will be clinical manifestations of the EEG signature pattern.  Tr. 244.  The EEG patterns is a "grossly abnormal EEG background," called "hypsarrhythmia," which has a "variable description" but is unquestionably abnormal.  Tr. 244-45.  The third diagnostic feature of IESS is that it is "often associated with developmental delay or [] regression," although the presentation is "highly variable."  Tr. 245-46.

While there is a "multiplicity of associations with the presence of [IESS]," Dr. Zempel does not consider it to be an autoimmune condition.  Tr. 247-48; see also Resp. Ex. D at 5.  He also testified that vaccine causation of infantile seizures has been extensively studied, and "there is no good literature that supports this hypothesis very strongly."  Tr. 249.  He disagreed with Dr. Shafrir's opinion that infantile spasms is a post-vaccination inflammatory condition.  Resp. Ex. B at 7-8.

He also disagreed with Dr. Shafrir's theory based on autoimmunity.  Dr. Zempel did not dispute the presence of neuronal autoantibodies in some cases but opined "the significance and relevance" of such antibodies must be shown, taking into account the facts and circumstances within the context of current medical literature.  Resp. Ex. B at 8.  The articles and case reports cited by Dr. Shafrir describe different autoimmune illnesses (e.g., acute disseminated encephalomyelitis or hemolytic anemia), or different vaccines (DTP instead of DTaP).  Id.  Dr. Zempel opined that "DTP and DTaP are different vaccine formulations used across different time eras" and that DTaP has been more widely used and has "reduced associations with side effects."  Id.

Dr. Zempel also disagreed there is evidence to support Dr. Shafrir's opinion related to homology between the DTaP vaccination and brain proteins.  Resp. Ex. B at 9.  Because this theory is not supported by proof that "antibodies are causative of infantile spasms after vaccination," Dr. Zempel opined "it is speculative and theoretical."  Id.

Fundamentally, Dr. Zempel disagreed with Dr. Shafrir's interpretation of medical literature.  In response to Dr. Shafrir's statement that "there is [a] good amount of literature than can support the theory that autoimmune reaction induced by the vaccine caused [K.H.'s] infantile spasms," Dr. Zempel concluded that they had a fundamental disagreement, as "[s]uch a sweeping conclusion is not well supported and similarly stated in the extant medical literature."  Id.

Lastly, Dr. Zempel opined there is no epidemiological support for any association between vaccination and IESS.  Resp. Ex. D at 2.  He noted that possible associations have been studied for years, but a relationship has not been shown.  Id.

### ii.    <u>Althen</u> Prong Two

Dr. Zempel opined that based on the evidence, and more likely than not, "vaccination is not the cause of [K.H.'s] infantile spasm syndrome."  Tr. 241.  He explained that the lack of a known cause, despite an advanced diagnostic workup and genetic testing, is frustrating to his patients.  Resp. Ex. B at 9.  But he disagreed that this a reason to "default to a backup explanation that vaccines can cause infantile spasms."  Id.  He also noted that K.H.'s treating

physicians did not associate K.H.'s infantile spasms to vaccination.  Id.

Dr. Zempel agreed that K.H. "definitely meets the diagnostic criteria for [IESS]."[54]  Tr. 241.  Turning to K.H.'s clinical course, Dr. Zempel reviewed pertinent medical records prior to vaccination to identify signs and symptoms that could be associated with underlying neurological conditions that predated K.H.'s onset of infantile spasms.  Tr. 249-50.  Dr. Zempel disagreed with Dr. Shafrir that K.H.'s early visits, prior to his first vaccinations on April 7, show that he was normal.  Id.  First, Dr. Zempel opined that K.H.'s pediatrician saw plagiocephaly that was not simply due to positioning associated with the back-to-sleep campaign; instead, it "was rather asymmetric, both . . . in the face and the skull," requiring workup with an evaluation and CT scan.  Tr. 250.  Dr. Zempel explained that plagiocephaly can indicate a neurological problem with an associated neuromuscular problem and causes an inability for an infant to move normally, and that here, this abnormality predated K.H.'s infantile spasms.  Tr. 250-51; see Resp. Ex. D at 1; Resp. Ex. F at 1 ("This suggests risk for neurological abnormality/developmental delay prior to the onset of his infantile spasms.").[55]  Second, K.H. was referred for evaluation of feeding difficulties, which can be "a warning sign" of an underlying neurologic abnormality.  Tr. 250, 252.

Dr. Zempel agreed that while K.H.'s treating neurologists referenced a diagnosis of Lennox-Gastaut syndrome, Petitioner testified that K.H. had not been diagnosed with the condition and did not meet the criteria for the diagnosis.  Tr. 253-54.

Dr. Zempel disagreed with Dr. Shafrir's opinion that K.H. developed encephalopathy after vaccination and that encephalopathy caused his infantile spasms.  Tr. 255; Resp. Ex. D at 2.  Dr. Zempel testified that current medical literature does not contemplate such a mechanism.  Tr. 290.  Further, he opined that "[e]ncephalopathy is not itself a cause," but "a term describing abnormal mental status and behavior [] typically caused by an underlying mechanism (traumatic, infectious, metabolic, autoimmune[,] among [other] causes)."  Resp. Ex. D at 2; see also Tr. 291 ("Dr. Shafrir [] is conflating a descriptive term that describes symptoms with a mechanism.  Encephalopathy is not a mechanism. . . .  Encephalopathy is a descriptor of a clinical state.").  Dr. Zempel agreed that encephalopathic symptoms can precede the onset of spasms in IESS, but that it "does not result in infantile spasms."  Resp. Ex. D at 2; see also Tr. 291.

---

[54] Dr. Zempel discussed the terminology surrounding the diagnosis and West syndrome, explaining that West syndrome is probably the same as infantile spasms.  Tr. 241-42; see also Resp. Ex. F, Tab 5 (Sameer M. Zuberi et al., ILAE Classification and Definition of Epilepsy Syndromes with Onset in Neonates and Infants: Position Statement by the ILAE Task Force on Nosology and Definitions, 63 Epilepsia 1349 (2022)).

[55] For literature discussing plagiocephaly and its association with developmental issues, see Resp. Ex. F, Tab 1 (Robert I. Miller & Sterling K. Clarren, Long-Term Developmental Outcomes in Patients with Deformational Plagiocephaly, 105 Pediatrics 1 (2000)); Resp. Ex. F, Tab 2 (Alexandra L.C. Martiniuk et al., Plagiocephaly and Developmental Delay: A Systematic Review, 38 J. Dev. Behav. Pediatr. 67 (2017)).

Infantile spasms have a variable onset period characterized by behavior change which is an integral part of the syndrome, and this syndrome includes epileptic spasms. Resp. Ex. D at 2. Dr. Zempel explained that Dr. Shafrir tries to "split the onset of infantile spasms into two events," however, the onset of spasms in April 2017 "is sufficient to characterize the medical course." Id. Dr. Zempel disagreed with Dr. Shafrir's attempt at this separation between an "ill-defined encephalopathy" from the syndrome, noting that the "progression to infantile spasms clearly is the core of his assertion." Id.; see also Resp. Ex. F at 2 (opining "spasms are not caused by a generic encephalopathy; rather, they are part of the entire IESS syndrome").

Dr. Zempel agreed acute encephalopathy is "a change in the level of consciousness," as defined in the Vaccine Injury Table. Tr. 292. Patients who meet this definition may have an underlying infection, seizure, or intoxication. Id. An EEG may be done to determine why the patient is not responding appropriately. Id. Dr. Zempel opined that K.H.'s symptoms described by Petitioner at the hearing, however, were not consistent with a change in consciousness. Id. Dr. Zempel emphasized that this does not mean that Petitioner did not see a change in K.H.'s responsiveness, but that the change noted is different than encephalopathy. Tr. 293. The specific symptoms described by Petitioner were "likely . . . related to the onset of the [IESS]." Tr. 294-95.

In IESS, Dr. Zempel explained that "the seizures themselves do not explain the degree of cognitive dysfunction or developmental delay." Tr. 294. In other words, the seizures are not "the primary driver" of these other problems, but instead, the underlying brain abnormality results in the syndrome. Id. Dr. Zempel concluded that "there is no indication that vaccination caused [K.H.'s] IESS." Tr. 302. He further testified that even if K.H. had not received vaccinations in April and August 2017, "he likely would have had infantile spasms." Id. Thus, he concluded vaccinations did not cause K.H.'s infantile spasms. Id.

Regarding Dr. Shafrir's theory based on inflammation, Dr. Zempel explained there are several tests used to identify inflammation or an autoimmune attack on the brain, including a brain MRI. Tr. 256-57. K.H. had a brain MRI without contrast on May 2, 2017. Tr. 257-58 (citing Pet. Ex. 20 at 62-63). Multiple sequences were performed, and many of these were sensitive for inflammation and/or autoimmune conditions. Tr. 257. Although gadolinium contrast was not given (which is helpful in identifying inflammation), Dr. Zempel opined it is not necessary. Tr. 257-58. At Dr. Zempel's institution, gadolinium contrast is not used unless there is a "high suspicion by the ordering physician" that there was "something valuable to be gained" by using the contrast for the procedure. Id. K.H.'s brain MRI was normal and did not show neuroinflammation. Tr. 259-62. Another test for inflammation/autoimmunity is CSF. Tr. 258-59. And in K.H.'s case, his CSF showed normal protein, which indicated there was no inflammation. Tr. 259. Further, Dr. Zempel testified that K.H.'s treating physicians did not diagnosis an inflammatory condition; he was not diagnosed or treated with encephalitis. Tr. 262-63.

Next, Dr. Zempel discussed K.H.'s treatment. He opined that K.H. was treated with "state-of-the-art" medication (steroids) for IESS. Tr. 263. Although steroids are the first line of treatment for IESS, Dr. Zempel testified that only slightly more than 50% of IESS cases are resolved using steroids. Tr. 263-64. This statistic applies to cases of IESS where the causes are

37

both known and unknown (idiopathic). Tr. 264-65. According to Dr. Zempel, there is "an interaction of steroids . . . with inhibitory neurotransmission." Tr. 265-66. He agreed, however, with Dr. Shafrir that there is an inflammatory component to epilepsy, "especially severe epilepsy." Tr. 266. But this inflammation is caused by the inflammatory property of serum; prolonged seizures disrupt the brain barrier, resulting in leakage of serum into the brain, and serum contains an inflammatory component. Tr. 266-67. Finally, Dr. Zempel disagreed with Dr. Shafrir's opinion that treatment with steroids support the idea that K.H.'s spasms were caused by an autoimmune process because medical literature does not support such a conclusion. Tr. 267. Although medical literature may identify autoimmunity among many of the potential causes for infantile spasms, Dr. Zempel stated it is "not well validated in the literature." Id.; see also Resp. Ex. D at 10.

Regarding K.H.'s relapse of seizures on September 1, 2017, Dr. Zempel opined this reoccurrence of infantile spasms was likely caused by his steroid taper and not vaccination. Tr. 269-70. He cited the Cochrane review authored by Hancock et al. as the best source of relevant information on this issue. Tr. 270 (citing Resp. Ex. D, Tab 3). Moreover, Dr. Zempel explained that "early and medium term recurrences . . . are quite common." Tr. 271. Regardless, the "most likely explanation" for K.H.'s recurrence of spasms was the fact that he was being "tapered off the steroid therapy." Id.; see also Resp. Ex. F at 2-4.

Specific to K.H., Dr. Zempel did not find an etiology for IESS in the medical records. Tr. 272. Although genetic testing has not been informative to date, Dr. Zempel believed it is "very likely" that there is an important genetic factor. Id.; see also Resp. Ex. D at 7-8. The field of genetics is expanding rapidly, and he stated that many of his patients now have genetic diagnosis as compared to ten years ago. Tr. 272-74. Even though a specific genetic cause has not been found in K.H.'s case, Dr. Zempel stated this fact does not rule out a genetic factor as a possible cause. Tr. 275; Resp. Ex. D at 7-8. Additionally, Dr. Zempel testified that K.H.'s family history of seizures "influences the likelihood that there's an underlying genetic factor." Tr. 275; see also Resp. Ex. D at 7-8.

The lack of a clear cause for K.H.'s IESS does not affect Dr. Zempel opinions about vaccine causation. Tr. 276. He noted that none of K.H.'s treating physicians indicated that the vaccinations caused his spasms. Id. Dr. Zempel noted that multiple treating physicians opined that the vaccines were not a likely cause of K.H.'s IESS. Id.; see, e.g., Pet. Ex. 7 at 136-37 (Dr. Sims' stating "there is no proven relationship between vaccines and infantile spasms and there is no contraindication to vaccines"); Pet. Ex. 9 at 171 (Dr. Rios reiterating K.H.'s vaccinations were not related to his infantile spasms); Pet. Ex. 20 at 292 (genetic counselor Ms. Schatz noting "most likely[,] [] [K.H.] has an underlying genetic condition that is the cause of his medical history, and that the vaccines were likely not the cause"); Pet. Ex. 115 at 87 (Petitioner acknowledging providers had told her K.H.'s spasms were not related to his vaccinations).

Dr. Zempel reviewed and criticized literature cited by Dr. Shafrir. See generally Resp. Exs. B, D, F. For example, Nouno et al.[56] was cited by Dr. Shafrir for support that vaccines can

---

[56] Shin Nouno et al., Adverse Effects on EEG and Clinical Condition After Immunizing Children with Convulsive Disorders, 32 Acta Paediatr. Jpn. 357 (1990).

cause the appearance of epileptic discharges in EEGs in children with epilepsy.  Tr. 70-71 (citing Pet. Ex. 72).  Dr. Zempel discussed this paper at length at the hearing, disagreeing with Dr. Shafrir's interpretation.  Tr. 285-89.  Dr. Zempel noted that Nouno et al. obtained data from 1986 to 1988 and the children were older than K.H.  Tr. 285.  Fifty-three of the 61 children given 116 immunizations in the study were on oral anticonvulsive medications for diagnoses of febrile convulsions or epilepsy.  Tr. 285-86.  EEGs were not contemporaneous with vaccinations but may have been done months or a year before, and there was "no strong statistical analysis" performed.  Tr. 289.  Overall, Dr. Zempel concluded that the study design did not allow for the conclusion that vaccinations caused EEG spike increase or reappearance, especially given the intervening events which could have occurred before or after vaccination.  Tr. 289-90.

Lastly, Dr. Zempel disagreed there was a challenge/rechallenge as posited by Dr. Shafrir. Relapse of spasms and "lack of efficacy of first line treatments" are common in children with infantile spasms.  Resp. Ex. D at 3.  In support, he cited several studies, including the 2005 United Kingdom Infantile Spasms Study ("UKISS") from Lux et al.,[57] which compared treatment outcomes between hormone treatment and vigabatrin up to age 14 months in 107 infants.  Resp. Ex. D, Tab 4 at 1.  Dr. Zempel observed that the study showed "a considerable . . . rate of relapse."  Resp. Ex. D at 4 (citing Resp. Ex. D, Tab 4).  Of the infants who received hormone treatment (steroids or ACTH), 39 did not have spasms at 25 days, but this decreased to 29 infants at 50 days, with "an overall response rate of slightly over 50% at 50 days."  Id.  A larger study from O'Callaghan et al.[58] in 2017 again showed that "relapse was not uncommon." Id. (citing Resp. Ex. D, Tab 5).  In a U.S. cohort published in 2016, infants treated with corticosteroids had no response, a late response, or relapse within three months in 61% of cases. Id. (citing Resp. Ex. D, Tab 2 at 7 tbl. 3).[59]  Dr. Zempel stated that "more than one third" who "initially responded ultimately relapse[d] to first line therapy by three months."  Id.

Here, Dr. Zempel opined that K.H. had "waning of the effectiveness of treatment of his infantile spasms, even prior to the second vaccination."  Resp. Ex. D at 8.  He noted that K.H. had treatment for approximately ten weeks, into July, which is longer than "the typical [four] weeks for most initial steroid courses."  Id.  It was longer due to an intervening illness and hospitalization, but as shown by the studies he cited, relapse is not uncommon, and K.H.'s relapse "does not support Dr. Shafrir's contention of a challenge/rechallenge situation."  Id. at 4, 8.  Based on his knowledge of medical literature and experience in his clinical practice, Dr. Zempel did not find K.H.'s recurrent spasms to be unusual.  Id. at 8.

---

[57] Andrew L. Lux et al., The United Kingdom Infantile Spasms Study (UKISS) Comparing Hormone Treatment with Vigabatrin on Developmental and Epilepsy Outcomes to Age 14 Months: A Multicentre Randomised Trial, 4 Lancet Neurol. 712 (2005).

[58] Finbar J.K. O'Callaghan et al., Safety and Effectiveness of Hormonal Treatment Versus Hormonal Treatment with Vigabatrin for Infantile Spasms (ICISS): A Randomised, Multicentre, Open-Label Trial, 16 Lancet Neurol. 33 (2017).

[59] Kelly G. Knupp et al., Response to Treatment in a Prospective National Infantile Spasms Cohort, 79 Ann. Neurol. 475 (2016).

Further, Dr. Zempel opined that there was "[n]o evidence of an immunological response" causing K.H.'s spasms after either the first or second set of vaccinations.  Resp. Ex. D at 9 (emphasis omitted).  This, plus the lack of support by the treating physicians provide additional reasons Dr. Zempel does not believe it is appropriate to attribute the recurrence of K.H.'s spasms to challenge/rechallenge.  Id.  The fact that K.H.'s EEG was worse in September as compared to the previous EEG, "simply reflects the recurrence of the infantile spasms."  Id.

### iii.    **Althen Prong Three**

Dr. Zempel began his opinions about onset by explaining that it is difficult to precisely determine the onset of IESS, although here, "[t]he onset of the clear expression of the syndrome was [April 30, 2017], with concern expressed" in the two-to-three-week period before that date. Resp. Ex. B at 6.  Telephone records on April 24, 2019 mention K.H. avoided eye contact, and on April 28, 2019, he did not focus on Petitioner's face or toys.  Id.  However, before these dates, on April 7, 2017, the medical records document concerns about K.H.'s head shape and feeding problems.  Id.

According to Dr. Zempel, the typical onset of IESS is between three to 12 months of age. Tr. 278.  Onset at an earlier age may affect the risk of recurrence.  Tr. 279.  Due to this age range of onset, and the vaccination schedule, Dr. Zempel testified that there is an overlap of time common to receipt of vaccines and the presentation of spasms in IESS.  Tr. 278-79.  Regardless of this overlap, medical literature does not provide evidence that "supports the contention that vaccinations cause infantile spasms."  Tr. 280.  Dr. Shafrir characterized the 1977 paper from Melchoir[60] as supportive of vaccine causation, but Dr. Zempel opined "the authors themselves . . . did not support that conclusion."  Tr. 281 (citing Pet. Ex. 50 at 3 ("impl[ying] that a causal connection between whooping cough [pertussis] immunization and infantile spasms is very unlikely except in a few cases and that time-coincidence is the most likely factor")).

Regarding the NCES data,[61] which was secondarily analyzed in Bellman et al.,[62] Dr. Zempel noted the data "suggested that these vaccines do not cause infantile spasms but may trigger their onset in those children in whom the disorder is destined to develop."  Tr. 284 (quoting Pet. Ex. 51 at 1).  Even though K.H. did not receive the DTP vaccination examined by the NCES (he received the DTaP vaccination), Dr. Zempel opined that the data from the paper provides strong support weighing against causation of infantile spasms due to vaccination.  Tr. 284-85; see also Resp. Ex. D at 2.

---

[60] J.C. Melchior, Infantile Spasms and Early Immunization Against Whooping Cough, 52 Arch. Dis. Child. 134 (1977).

[61] See Pet. Ex. 52.

[62] M.H. Bellman et al., Infantile Spasms and Pertussis Immunisation, 1 Lancet 1031 (1983).

### 3.    Respondent's Expert, Dr. Craig Platt[63]

#### a.    Background and Qualifications

Dr. Platt is a clinical immunologist with a board certification in allergy and clinical immunology.  Resp. Ex. A at 1; Resp. Ex. G at 8.  After obtaining his M.D. and Ph.D. in immunobiology (cellular biology of dendritic cells, which are required for an adaptive immune response) at Yale School of Medicine, he completed a residency in pediatrics and a fellowship in allergy/immunology at Boston's Children's Hospital.  Tr. 310-11; Resp. Ex. A at 1; Resp. Ex. G at 1.  Since 2016, Dr. Platt has taught pediatrics at Harvard Medical School and has worked as an assistant physician in the immunology division at Boston Children's Hospital.  Tr. 311; Resp. Ex. G at 1-2.  His "clinical expertise is in the diagnosis and treatment of allergic and immunologic diseases;" he "evaluate[s] and treat[s] patients with a broad range of immune-mediated diseases including autoimmune, hypersensitivity[,] and immunodeficiency disorders" and "patients with various reactions to drugs and vaccines."  Resp. Ex. A at 1; see also Tr. 314-15.  His "current research focuses on the genetics of immunodeficiency and immune dysregulation syndromes."  Resp. Ex. A at 1.  Dr. Platt has co-authored approximately 45 peer-reviewed articles and three book chapters, and he has authored an article on vaccine use in patients with immunodeficiency disorders for UpToDate.  Id.; Resp. Ex. G at 9-15; Tr. 316.

#### b.    Opinion

##### i.    Althen Prong One

Dr. Platt opined vaccines do not cause infantile spasms or encephalopathy.  Tr. 354.  For support, he cited Brown et al.,[64] who summarized the literature and/or studies that have looked at associations between vaccination and adverse neurological outcomes and found no evidence that vaccinations cause infantile spasms.  Tr. 323 (citing Resp. Ex. A, Tab 7).  Dr. Platt described other studies that assessed this risk and found no association between the DTaP (or DTP) vaccination and neurological complications.  Tr. 341-42 (citing Resp. Ex. A, Tab 8 (observing no increased risk for seizures after DTaP vaccination among children aged six weeks to 23 months);[65] Resp. Ex. A, Tab 9 (finding "[n]o convincing evidence that DTP caused major

---

[63] Dr. Platt filed three expert reports.  Resp. Exs. A, C, E.  Many of Dr. Platt's opinions expressed in his reports and at the hearing are similar or duplicative of those offered by Dr. Zempel.  For the sake of brevity, the undersigned has not summarized similar or duplicative opinions herein.

[64] Natasha J. Brown et al., Vaccination, Seizures, and 'Vaccine Damage', 20 Curr. Opin. Neurol. 181 (2007).

[65] Wan-Ting Huang et al., Lack of Association Between Acellular Pertussis Vaccine and Seizures in Early Childhood, 126 Pediatrics e263 (2010).

neurological damages");[66] Resp. Ex. A, Tab 10 (noting over a ten year study period, seven cases of encephalopathy or encephalitis with an onset within seven days of receiving a pertussis-containing vaccine (three whole cell, four acellular) and concluding neurologic illness was not attributed to vaccination in any case as all had a more likely cause);[67] Resp. Ex. A, Tab 11 ("This study did not find any statistically significant increased risk of onset of serious acute neurological illness in the [seven] days after DTP vaccine exposure for young children."));[68] see Resp. Ex. A at 10-13.

Further, Dr. Platt opined that infantile spasms are not considered to be an autoimmune condition. Tr. 320. Specific to Dr. Shafrir's theory of molecular mimicry, Dr. Platt opined there is no evidence that molecular mimicry is relevant to the pathogenesis of infantile spasms. Tr. 324. K.H.'s treating physicians did not test for antibodies, which Dr. Platt believed was evidence of the fact that none of the treating providers believed they were relevant to a likely causal mechanism or that they required investigation. Tr. 324-25.

Moreover, Dr. Platt explained that even if there was homology between vaccine components and brain tissue, that alone is insufficient to show that molecular mimicry can cause disease because there are many other factors required to induce molecular mimicry. Tr. 327-28. Dr. Platt explained the papers Dr. Shafrir cited in support of molecular mimicry (Pet. Exs. 63-67) show that it is very common for there to be homology between proteins sequences in humans and infections or vaccines. Tr. 326-28. For example, pertussis bacteria share 82,000 sequences with the human proteome. Tr. 328. Dr. Platt opined there is homology between any bacteria and human tissue, and because of this, homology alone does not support the theory of molecular mimicry, other than to say it is "theoretically possible." Id. Dr. Platt concluded that Dr. Shafrir's articles do not support his assertion that DTaP can cause an autoimmune condition. Id.

Turning to Dr. Shafrir's theory related to the innate immune system, Dr. Platt explained that the innate immune system can produce signs/symptoms such as a fever. Tr. 328-29. He opined that it is not uncommon for vaccination to cause fever and that fever can lower the seizure threshold and cause febrile seizures, which is a short-lived vaccine reaction that may occur within a couple of days after vaccination. Tr. 329. But this mechanism does not extend to the facts present here.

In response to Petitioner's theory based on challenge/rechallenge, Dr. Platt raised several concerns. Tr. 330; Resp. Ex. A at 7-8. First, he opined that challenge/rechallenge does not fit with the chronology here. Tr. 330. After vaccination, the adaptive immune response occurs over

---

[66] T.M. Pollock & Jean Morris, A 7-Year Survey of Disorders Attributed to Vaccination in North West Thames Region, 1 Lancet 753 (1983).

[67] Dorothy L. Moore et al., Lack of Evidence of Encephalopathy Related to Pertussis Vaccine: Active Surveillance by IMPACT, Canada 1993-2002, 23 Pediatr. Infect. Dis. J. 568 (2004).

[68] James L. Gale et al., Risk of Serious Acute Neurological Illness After Immunization with Diphtheria-Tetanus-Pertussis Vaccine, 271 JAMA 37 (1994).

days to weeks, and an antibody-mediated immune response (molecular mimicry) takes at least one to two weeks.  Id.  However, when given a second vaccine, immunological memory results in a much more rapid response, usually "within a few days."  Tr. 330-31 (citing Resp. Ex. A, Tab 5 at 2 ("Memory cells respond more rapidly to antigen stimulation than do naïve cells specific for the same antigen.")).[69]  Here, the delay of recurrent spasms until about one month after the second vaccinations does not fit within the challenge/rechallenge model.  Id.; Resp. Ex. A at 7-8.  As an example, Dr. Platt noted that when a patient gets COVID, the rapid tests may remain positive for up to 10 days, which is the length of time it takes to get the initial infection under control; however, if exposed a second time, the immune response is much quicker.  Tr. 331.

The second problem identified by Dr. Platt with the challenge/rechallenge scenario is that it is not applicable to illnesses where the natural course of the illness may include relapses, especially during weaning or withdrawal of treatment.  Tr. 331.  Here, Dr. Zempel described that it is not uncommon for patients to have a relapse (recurrent spasms).  Id.  Dr. Platt opined that because the timing is inconsistent with a secondary exposure, that relapses are known to occur during the illness, and because recurrence occurred while medication was being withdrawn, the confounding factors are more likely causal than challenge/rechallenge.  Tr. 331-32.

Dr. Platt reviewed the medical records to delineate K.H.'s steroid taper schedule.  He agreed K.H. was on high dose steroids (15 mg or 2 mg per kg of weight) prior to the taper, and that the last high dose was given July 2.  Tr. 333.  K.H. received his second set of vaccinations on August 1.[70]  Id.  K.H. had a recurrence of his spasms on September 1, about one month later.  Tr. 333-34.  Dr. Platt opined that it is "extremely unlikely" that a vaccine reaction would be delayed by one month. Tr. 334.

To explain challenge/rechallenge, Dr. Platt offered an example from his clinical practice.  Some of his patients with immune deficiency disorders receive pneumococcal vaccines every five years to prevent the risk of streptococcal pneumonia.  Tr. 335.  If one of these patients had seizures within a few days after vaccination, and then five years later, had seizures again within days of the same type of vaccination, with no intervening seizures or seizure disorder, Dr. Platt would agree that the seizures were triggered by the vaccinations.  Id.

Regarding molecular mimicry, Dr. Platt discussed Dr. Shafrir's reference to Stojković et al., a study examining a mouse model of EAE used to study MS.  Tr. 344-45 (citing Pet. Ex. 58).  Dr. Platt explained that the study used a very artificial system with engineered mice to induce EAE in the context of MS, not infantile spasms.  Id.  Dr. Platt also discussed Shandra et al., which used a mouse model more relevant to infantile spasms.  Tr. 345 (citing Pet. Ex. 95).  Shandra et al. tried to induce infantile epileptic encephalopathy in animals using lipopolysaccharides and a chemotherapy agent into the animal's brain to induce inflammation,

---

[69] Cellular and Molecular Immunology (Abul K. Abbas et al. eds., 9th ed. 2018).  Only select pages from select chapters were filed.

[70] According to Dr. Platt, most doctors and the applicable guidelines state it is reasonable to proceed with vaccination one month after high-dose steroids are discontinued.  Tr. 333-34.

which Dr. Platt explained was "not at all similar to [] vaccination" in humans.  Tr. 345-46.  The usual response to vaccines may include local swelling at the vaccine site due to the innate immune response and fever also due to the innate immune response.  Tr. 346-47.  Febrile seizures may occur due to the lowered seizure threshold caused by cytokines.  Tr. 347.

Dr. Platt discussed the DTaP vaccine package insert, specifically the section on post-marketing collection of data, which he described as voluntary reporting of adverse events that clinicians think may be related to vaccination.  Tr. 347-48.  Along with this data, there is a caveat noting that "[b]ecause these events are reported voluntarily from a population of uncertain size, it is not possible to reliably estimate their frequency or establish a causal relationship to vaccine exposure."  Tr. 348 (quoting Pet. Ex. 68 at 12).

On cross-examination, Dr. Platt agreed that vaccines can cause inflammation.  Tr. 360. He opined that vaccines are designed to cause a protective immune response and that process includes activation of the innate immune response, which causes inflammation.  Id.  However, Dr. Platt did not agree that vaccines cause brain inflammation.  Tr. 361.  Fever can lower the seizure threshold but that is not due to inflammation in the brain.  Tr. 361-62.

### ii.    **Althen Prongs Two and Three**

Dr. Platt opined that vaccination was "highly unlikely to be related to [K.H.'s] symptoms."  Tr. 317.  Further, he opined that vaccination more likely than not did not cause K.H.'s infantile spasms.  Tr. 354.  Dr. Platt opined that even if K.H. had not been vaccinated in April and August 2017, he would have developed infantile spasms.  Tr. 354-55.

In response to Dr. Shafrir's contention that K.H.'s seizures were immune-mediated because they responded to immunomodulators (steroids), Dr. Platt disagreed.  Tr. 349.  He explained that these medications are used for a number of other reasons; they are "prescribed for essentially any patient with infantile spasms, even patients with a known cause," which "suggests that it's not just being used for immunosuppressive properties."  Id.  Dr. Platt referenced Gupta and Appleton,[71] who listed other reasons for steroid use, including the correction of deficient enzymes, changes in intra or extracellular electrolyte ratios, correction of hypoglycemia, and reduction in cerebral water content.  Tr. 350 (citing Resp. Ex. C, Tab 3 at 3).

If K.H. had an autoimmune condition, Dr. Platt testified that K.H.'s treating physicians should have treated him with "immune-directed therapy" and they would not have weaned him off immunosuppressive medication.  Tr. 355-56.  Dr. Platt explained that "if any of his clinicians thought that it was more likely than not that he ha[d] an autoimmune condition," then they would have treated him as such, and because they did not, "it's clear that no one thinks that he has an autoimmune condition."  Tr. 355-56.

---

[71] R. Gupta & R. Appleton, Corticosteroids in the Management of the Paediatric Epilepsies, 90 Arch. Dis. Child. 379 (2005).

## III.    DISCUSSION

### A.    Standards for Adjudication

The Vaccine Act was established to compensate vaccine-related injuries and deaths.  § 10(a).  "Congress designed the Vaccine Program to supplement the state law civil tort system as a simple, fair and expeditious means for compensating vaccine-related injured persons.  The Program was established to award 'vaccine-injured persons quickly, easily, and with certainty and generosity.'"  Rooks v. Sec'y of Health & Hum. Servs., 35 Fed. Cl. 1, 7 (1996) (quoting H.R. Rep. No. 908 at 3, reprinted in 1986 U.S.C.C.A.N. at 6287, 6344).

Petitioner's burden of proof is by a preponderance of the evidence.  § 13(a)(1).  The preponderance standard requires a petitioner to demonstrate that it is more likely than not that the vaccine at issue caused the injury.  Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010).  Proof of medical certainty is not required.  Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991).  Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect."  Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1325 (Fed. Cir. 2006).  Instead, Petitioner may satisfy her burden by presenting circumstantial evidence and reliable medical opinions.  Id. at 1325-26.

In particular, Petitioner must prove that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury."  Moberly, 592 F.3d at 1321 (quoting Shyface v. Sec'y of Health & Hum. Servs., 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); see also Pafford v. Sec'y of Health & Hum. Servs., 451 F.3d 1352, 1355 (Fed. Cir. 2006).  The received vaccine, however, need not be the predominant cause of the injury.  Shyface, 165 F.3d at 1351.  A petitioner who satisfies this burden is entitled to compensation unless Respondent can prove, by a preponderance of the evidence, that the vaccinee's injury is "due to factors unrelated to the administration of the vaccine."  § 13(a)(1)(B).  However, if a petitioner fails to establish a prima facie case, the burden does not shift.  Bradley v. Sec'y of Health & Hum. Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

"Regardless of whether the burden ever shifts to the [R]espondent, the special master may consider the evidence presented by the [R]espondent in determining whether the [P]etitioner has established a prima facie case."  Flores v. Sec'y of Health & Hum. Servs., 115 Fed. Cl. 157, 162-63 (2014); see also Stone v. Sec'y of Health & Hum. Servs., 676 F.3d 1373, 1379 (Fed. Cir. 2012) ("[E]vidence of other possible sources of injury can be relevant not only to the 'factors unrelated' defense, but also to whether a prima facie showing has been made that the vaccine was a substantial factor in causing the injury in question."); de Bazan v. Sec'y of Health & Hum. Servs., 539 F.3d 1347, 1353 (Fed. Cir. 2008) ("The government, like any defendant, is permitted to offer evidence to demonstrate the inadequacy of the [P]etitioner's evidence on a requisite element of the [P]etitioner's case-in-chief."); Pafford, 451 F.3d at 1358-59 ("[T]he presence of multiple potential causative agents makes it difficult to attribute 'but for' causation to the vaccination. . . .  [T]he Special Master properly introduced the presence of the other unrelated contemporaneous events as just as likely to have been the triggering event as the vaccinations.").

## B.    Factual Issues

A petitioner must prove, by a preponderance of the evidence, the factual circumstances surrounding her claim.  § 13(a)(1)(A).  To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. See Burns v. Sec'y of Health & Hum. Servs., 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records).  The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions."  § 13(b)(1)(A).

Contemporaneous medical records, "in general, warrant consideration as trustworthy evidence."  Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). But see Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d 1378, 1382 (Fed. Cir. 2021) (rejecting the presumption that "medical records are accurate and complete as to all the patient's physical conditions"); Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 538 (2011) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." (quoting Murphy v. Sec'y of Health & Hum. Servs., 23 Cl. Ct. 726, 733 (1991), aff'd per curiam, 968 F.2d 1226 (Fed. Cir. 1992))), recons. den'd after remand, 105 Fed. Cl. 353 (2012), aff'd mem., 503 F. App'x 952 (Fed. Cir. 2013).

However, there are situations in which compelling testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. Campbell v. Sec'y of Health & Hum. Servs., 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Lowrie v. Sec'y of Health & Hum. Servs., No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("[W]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting Murphy, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded.  Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley, 991 F.2d at 1575.

Despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms.  Valenzuela v. Sec'y of Health & Hum. Servs., No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); see also Eng v. Sec'y of Health & Hum. Servs., No. 90-1754V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb. 18, 1994) (noting Section 13(b)(2) "must be construed so as to give effect also to § 13(b)(1) which directs the special master or court to consider the medical records (reports, diagnosis, conclusions, medical judgment, test reports, etc.) but does not require the special master or court to be bound by them").

46

### C.    Causation

To receive compensation through the Program, Petitioner must prove either (1) that K.H. suffered a "Table Injury"—i.e., an injury listed on the Vaccine Injury Table—corresponding to a vaccine that he received, or (2) that K.H. suffered an injury that was actually caused by a vaccination.  See §§ 13(a)(1)(A), 11(c)(1); Capizzano, 440 F.3d at 1319-20.  Petitioner must show that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury."  Moberly, 592 F.3d at 1321 (quoting Shyface, 165 F.3d at 1352-53).

Because Petitioner does not allege that K.H. suffered a Table Injury, she must prove that the vaccines K.H. received caused his injury.  To do so, she must establish, by preponderant evidence: (1) a medical theory causally connecting the vaccines and K.H.'s injury ("Althen Prong One"); (2) a logical sequence of cause and effect showing that the vaccines were the reason for K.H.'s injury ("Althen Prong Two"); and (3) a showing of a proximate temporal relationship between the vaccines and K.H.'s injury ("Althen Prong Three").  § 13(a)(1); Althen, 418 F.3d at 1278.

The causation theory must relate to the injury alleged.  Petitioner must provide a sound and reliable medical or scientific explanation that pertains specifically to this case, although the explanation need only be "legally probable, not medically or scientifically certain."  Knudsen v. Sec'y of Health & Hum. Servs., 35 F.3d 543, 548-49 (Fed. Cir. 1994).  Petitioner cannot establish entitlement to compensation based solely on her assertions; rather, a vaccine claim must be supported either by medical records or by the opinion of a medical doctor.  § 13(a)(1).  In determining whether a petitioner is entitled to compensation, the special master shall consider all material in the record, including "any . . . conclusion, [or] medical judgment . . . which is contained in the record regarding . . . causation."  § 13(b)(1)(A).  The undersigned must weigh the submitted evidence and the testimony of the parties' proffered experts and rule in petitioner's favor when the evidence weighs in her favor.  See Moberly, 592 F.3d at 1325-26 ("Finders of fact are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence."); Althen, 418 F.3d at 1280 (noting that "close calls" are resolved in petitioner's favor).

Testimony that merely expresses the possibility—not the probability—is insufficient, by itself, to substantiate a claim that such an injury occurred.  See Waterman v. Sec'y of Health & Hum. Servs., 123 Fed. Cl. 564, 573-74 (2015) (denying Petitioner's motion for review and noting that a possible causal link was not sufficient to meet the preponderance standard).  The Federal Circuit has made clear that the mere possibility of a link between a vaccination and a petitioner's injury is not sufficient to satisfy the preponderance standard.  Moberly, 592 F.3d at 1322 (emphasizing that "proof of a 'plausible' or 'possible' causal link between the vaccine and the injury" does not equate to proof of causation by a preponderance of the evidence); Boatmon v. Sec'y of Health & Hum. Servs., 941 F.3d 1351, 1359-60 (Fed. Cir. 2019).  While certainty is by no means required, a possible mechanism does not rise to the level of preponderance.  Moberly, 592 F.3d at 1322; see also de Bazan, 539 F.3d at 1351.

## IV.   CAUSATION ANALYSIS

### A.   **Althen** Prong One

Under Althen prong one, Petitioner must set forth a medical theory explaining how the received vaccine could have caused the sustained injury.  Andreu, 569 F.3d at 1375; Pafford, 451 F.3d at 1355-56.  Petitioner's theory of causation need not be medically or scientifically certain, but it must be informed by a "sound and reliable medical or scientific explanation."  Knudsen, 35 F.3d at 548; see also Veryzer v. Sec'y of Health & Hum. Servs., 98 Fed. Cl. 214, 223 (2011) (noting that special masters are bound by both § 13(b)(1) and Vaccine Rule 8(b)(1) to consider only evidence that is both "relevant" and "reliable").  If petitioner relies upon a medical opinion to support her theory, the basis for the opinion and the reliability of that basis must be considered in the determination of how much weight to afford the offered opinion.  See Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d 1339, 1347 (Fed. Cir. 2010) ("The special master's decision often times is based on the credibility of the experts and the relative persuasiveness of their competing theories."); Perreira v. Sec'y of Health & Hum. Servs., 33 F.3d 1375, 1377 n.6 (Fed. Cir. 1994) (stating that an "expert opinion is no better than the soundness of the reasons supporting it" (citing Fehrs v. United States, 620 F.2d 255, 265 (Ct. Cl. 1980))).

The undersigned finds that Petitioner has failed to prove Althen prong one by preponderant evidence for the following reasons.

First, in his expert reports and at the hearing, Dr. Shafrir opined that the DTaP vaccine can cause encephalopathy, and that encephalopathy then causes infantile spasms.  See, e.g., Pet. Ex. 24 at 55, 63 (indicating his theory is that "immunization [] caus[ed] encephalopathy culminating in infantile spasms"); Pet. Ex. 78 at 2 ("[K.H.] did not have infantile spasms after the vaccination.  He had an onset of encephalopathy . . . [that] evolved[] [and] [a]s a result . . . , [K.H.] developed infantile spasms."); Pet. Ex. 116 at 10 (explaining encephalopathy preceded the onset of infantile spasms); Tr. 62-64, 98 (indicating his theory to be "the vaccine caused the brain inflammation, causing encephalopathy, causing infantile spasm"), 118 (testifying the vaccine led to "inflammation [that] caused encephalopathy . . . [that] progressed and culminated [into] infantile spasms").

In response, Dr. Zempel explained IESS is a syndrome that encompasses behavior changes and epileptic spasms, signifying an underlying neurological condition.  Dr. Zempel further explained that encephalopathy is not a cause or a mechanism that can cause infantile spasms.  Dr. Zempel disagrees with Dr. Shafrir's attempt to separate an "ill-defined encephalopathy" from the syndrome, explaining that "spasms are not caused by a generic encephalopathy; rather they are part of the entire IESS syndrome."  Resp. Ex. D at 2; Resp. Ex. F at 2.

The undersigned agrees with Dr. Zempel and finds his opinions on this point persuasive.  The evidence filed herein does not show that encephalopathy is a mechanistic cause of infantile spasms or IESS.  First, the medical definition of the word encephalopathy does not support the idea that it is a causal mechanism.  For example, Dorland's defines "encephalopathy" as "any degenerative disease of the brain."  Encephalopathy, Dorland's Med. Dictionary Online,

https://www.dorlandsonline.com/dorland/definition?id=16202 (last visited May 28, 2026).  The Vaccine Injury Table Qualifications and Aids to Interpretation defines "acute encephalopathy" in a child younger than 18 months as "a significantly decreased level of consciousness that lasts at least 24 hours."  Pet. Ex. 48 at 4.  The Institute of Medicine defines encephalopathy as "[a] general term describing brain dysfunction.  Examples include encephalitis, meningitis, seizures, and head trauma."  Inst. of Med., Adverse Effects of Vaccines: Evidence and Causality 639 (Kathleen Stratton et al. eds., 2012).  These examples illustrate that the word is a descriptive term to explain an abnormality of the brain.  It is not used to explain how a neurological disorder occurs.

Secondly, as conceded by Dr. Shafrir, none of the medical literature he submitted supports the sequence that he advances, that encephalopathy is a causal mechanism that can cause infantile spasms.

Alternatively, Dr. Shafrir opined that the DTaP vaccination, and/or the vaccinations at issue, caused brain inflammation via the innate immune system and later the adaptive immune system played a role (molecular mimicry), and the "inflammation caused encephalopathy," and the encephalopathy "progressed and culminated [into] infantile spasms."  Tr. 118.

The first part of this broad theory, implicating the innate immune theory and inflammation in the context of infantile spasms, is not supported by preponderant evidence.  Dr. Shafrir cited two sources in support, the NCES study and the Vaccine Injury Table.  Neither of these sources describe inflammation as a causal mechanism of encephalopathy or infantile spasms.

Dr. Shafrir also referenced studies related to brain inflammation, but the methodology used was not comparable to vaccination.  Some of the studies (e.g., Lassmann et al. and Stojković et al.) induced EAE, an animal model of MS, using potent adjuvants or bacterial toxins to stimulate cytokine production and disrupt the blood brain barrier.  Pet. Exs. 57-58.  Shandra et al. studied an animal model of infantile spasms where the seizures were induced by injection of lipopolysaccharide into the cortex of the brain.  Pet. Ex. 95.  Although Dr. Shafrir argued that these studies demonstrated the peripheral vaccinations of pertussis can enhance brain inflammation, the studies were not comparable to vaccination.  He cited Vitaliti et al. for the proposition that a peripheral administered vaccination could induce brain inflammation.  Pet. Ex. 30.  But the authors did not reach such a conclusion.

The studies about cytokines also failed to support Dr. Shafrir's contention that vaccine-induced cytokines cause encephalopathy due to inflammation.  The literature shows that vaccinations elevate cytokines, but there was no finding of sustained elevation which would trigger encephalopathy two weeks later or infantile spasms approximately one month after vaccination.  While the undersigned has found that vaccinations can trigger cytokines and inflammation that can cause febrile seizures, this occurs very soon after vaccination, and not in a time frame at issue here.  See, e.g., Ginn ex rel. R.G. v. Sec'y of Health & Hum. Servs., No. 16-1466V, 2021 WL 1558342 (Fed. Cl. Spec. Mstr. Mar. 26, 2021); Fuller ex rel. B.F. v. Sec'y of Health & Hum. Servs., No. 15-1470V, 2019 WL 7576382 (Fed. Cl. Spec. Mstr. Dec. 17, 2019).

Third, there is not preponderant evidence the vaccinations here induce an adaptive immune response which causes infantile spasms, or that infantile spasms are an autoimmune condition.  The undersigned found Dr. Zempel's opinions on this issue more persuasive.  Although he agreed that neuronal autoantibodies have been found in infants with autoimmune encephalitis, the condition at issue here is different.  Further, this theory is not supported by medical literature.

Fourth, the undersigned finds that Dr. Shafrir did not accurately acknowledge the differences between the DTP and DTaP vaccinations.  Dr. Shafrir acknowledged that the acellular vaccine was developed specifically to reduce adverse reactions.  Tr. 205-06.  Dr. Zempel explained that "DTP and DTaP are different vaccine formulations used across different time eras" and that DTaP has been more widely used and has "reduced associations with side effects."  Resp. Ex. B at 8.  Dr. Platt also noted DTP and DTaP are "really different vaccines."  Tr. 340-41.  Additionally, past Vaccine Program cases have addressed the distinction between the DTP and DTaP vaccines, "persuasively explain[ing] at length why findings relating to the safety of the DTP vaccine are not applicable to the later DTaP vaccine."  M.D. v. Sec'y of Health & Hum. Servs., No. 10-611V, 2020 WL 8025384, at *14 (Fed. Cl. Spec. Mstr. Dec. 17, 2020) (listing cases that "indicate that epidemiological findings relating to the safety of DTP vaccines cannot be transferred to the DTaP vaccine").

Fifth, epidemiological evidence does not support Petitioner's case here.  Dr. Shafrir first opined "there is [a] good amount of literature that can support the theory that autoimmune reaction induced by the vaccine caused [K.H.'s] infantile spasms" as well as "a good amount of epidemiological evidence to suggest a causal relationship between pertussis vaccination and childhood encephalopathy."  Pet. Ex. 24 at 61, 69.  However, in his second report, he acknowledged "epidemiological studies are not appropriate for concluding causation here."  Pet. Ex. 78 at 8.  This is consistent with the literature cited by the parties, as well as the opinions of both Dr. Zempel and Dr. Platt, who agreed there is no epidemiological support.  Dr. Platt cited Brown et al., for example, who summarized the literature and/or studies that have looked at associations between vaccination and adverse neurological outcomes and found no evidence that vaccinations cause infantile spasms.  See Resp. Ex. A, Tab 7.  Other studies have also found no association between the DTaP (or DTP) vaccination and neurological complications.  See, e.g., Resp. Ex. A, Tabs 8-11.

Although a petitioner need not make a specific type of evidential showing (i.e., epidemiologic studies) to satisfy her burden, special masters shall still consider and weigh the evidence in the record, including the epidemiological studies filed.  See § 13(b)(1) (indicating the special master shall consider all materials in the record); Capizzano, 440 F.3d at 1325-26; Grant v. Sec'y of Health & Hum. Servs., 956 F.2d 1144, 1149 (Fed. Cir. 1992) (finding "epidemiological studies are probative medical evidence relevant to causation" and "considerable weight [is] due to epidemiological studies in the absence of direct evidence of actual causation").

Further, the undersigned notes that Dr. Shafrir's theory here has been rejected in cases where he has opined that vaccinations, especially the DTaP vaccination, cause encephalopathy or autoimmune-induced encephalopathy.  Although infantile spasms/IESS was not the specific

diagnosis at issue in these cases, Dr. Shafrir offered the same or similar mechanism of autoimmune encephalopathy.

In Austin, for example, Dr. Shafrir argued that the infant had encephalopathy caused by DTaP and relied on studies and/or cause reports about autoimmune encephalitis, although there was no evidence of autoantibodies or a diagnosis of autoantibody-associated encephalitis; his theory was rejected. Austin ex rel. K.A. v. Sec'y of Health & Hum. Servs., No. 05-579V, 2018 WL 3238608 (Fed. Cl. Spec. Mstr. May 15, 2018), mot for rev. denied, 141 Fed. Cl. 268, aff'd, 818 F. App'x 1005 (Fed. Cir. 2020). In Mattus-Lang, the special master found "Petitioner's expert [Dr. Shafrir] did not present preponderant evidence of an autoimmune encephalopathy" and "without an autoimmune response post vaccination, Petitioner's proposed biological mechanism is inapplicable." Mattus-Lang ex rel. D.J.W. v. Sec'y of Health & Hum. Servs., No. 15-113V, 2022 WL 4242140, at *2 (Fed. Cl. Spec. Mstr. Aug. 31, 2022). And in Walters, Dr. Shafrir opined that the infant developed "epileptic encephalopathy" due to "an excessive inflammatory response of the innate immune system due to the aluminum adjuvant in the DTaP vaccine and/or dysfunction of the adaptive immune system—specifically molecular mimicry involving cross reaction between the DTaP vaccine proteins and [] brain protein," which was similarly rejected by the special master. Walters ex rel. K.S.S.W. v. Sec'y of Health & Hum. Servs., No. 15-1380V, 2023 WL 3750716, at *7 (Fed. Cl. Spec. Mstr. June 1, 2023), mot for rev. denied, 2023 WL 5274006 (Fed. Cl. Aug. 16, 2023).

Cases involving infantile spasms (also referred to as West syndrome) have also resulted in denial in compensation due to failure to provide evidence of vaccine causation.[72] In Taylor, Petitioner's expert, Dr. Griesemer, opined that the pertussis component of DTaP interfered with transmission of inhibitory neuronal messages leading to increased seizure activity due to "uncoupling of G proteins from GABA receptors." Taylor ex rel. J.T. v. Sec'y of Health & Hum. Servs., No. 05-1133V, 2012 WL 4829293, at *8 (Fed. Cl. Spec. Mstr. Oct. 4, 2012). The special master noted that "[o]n this record, it has been shown to be not very likely that vaccination with an acellular pertussis vaccine could directly cause the syndrome diagnosed as cryptogenic infantile spasms. Boiled down to the essentials, the only evidence favoring the theory is the *ipse dixit* of Petitioner's expert." Id. at *25. The undersigned finds the same is true in the present case.

Compensation has also been denied in other cases where the petitioner's experts argued the DTaP vaccine caused infantile spasms via pro-inflammatory cytokines and/or the innate immune system. See, e.g., Bangerter ex rel. D.B. v. Sec'y of Health & Hum. Servs., No. 15-1186V, 2022 WL 439535, at *25 (Fed. Cl. Spec. Mstr. Jan. 18, 2022); Skorupska ex rel. N.S. v. Sec'y of Health & Hum. Servs., No. 16-1517V, 2026 WL 674607, at *14 (Fed. Cl. Spec. Mstr.

---

[72] Akers is another case involving infantile spasms and West syndrome; however, the infant had focal cortical dysplasia, distinguishing it from the present case. Akers ex rel. A.A. v. Sec'y of Health & Hum. Servs., No. 15-597V, 2021 WL 3560069 (Fed. Cl. Spec. Mstr. July 6, 2021). The causal theory was similar—that vaccines, and specifically the DTaP vaccine, can cause seizures and epilepsy through an inflammatory process and induction of cytokines; compensation was denied. Id.

Feb. 10, 2026); Lindholm ex rel. K.E.L. v. Sec'y of Health & Hum. Servs., No. 17-0154V, 2023 WL 5667583, at *26 (Fed. Cl. Spec. Mstr. Sept. 1, 2023).

Although decisions of other special masters are not binding, the undersigned finds the above cases instructive and follows the reasoning of her colleagues. See Boatmon, 941 F.3d at 1358; Hanlon v. Sec'y of Health & Hum. Servs., 40 Fed. Cl. 625, 630 (1998), aff'd, 191 F.3d 1344 (Fed. Cir. 1999).

The Federal Circuit in Kottenstette held that the petitioner provided preponderant evidence of a medical theory connecting the DTaP vaccine and infantile spasms. Kottenstette ex rel. C.K. v. Sec'y of Health & Hum. Servs., 861 F. App'x 433, 441-43 (Fed. Cir. 2021). However, the facts in Kottenstette are quite different than the facts and circumstances in this matter. The minor in Kottenstette, C.K., had her first infantile spasm within hours of her four-month vaccines, not 30 days later like K.H. Id. at 437, 441-43. Additionally, C.K. had an "explosive" onset hours after vaccination instead of the usual "insidious onset" of infantile spasms, and this presentation close in time to vaccination was significant to the special master's decision. Id. at 442-43.

Lastly, despite Dr. Shafrir's argument that the Table injury of encephalopathy post-DTaP vaccine is evidence in support of his theory, this case is not a Table case nor does the Table identify or discuss any causal mechanisms.

For the above-mentioned reasons, the undersigned finds that Petitioner failed to provide preponderant evidence of Althen prong one.

### B.    Althen Prong Two

Under Althen Prong Two, Petitioner must prove by a preponderance of the evidence that there is a "logical sequence of cause and effect showing that the vaccination was the reason for the injury." Capizzano, 440 F.3d at 1324 (quoting Althen, 418 F.3d at 1278). "Petitioner must show that the vaccine was the 'but for' cause of the harm . . . or in other words, that the vaccine was the 'reason for the injury.'" Pafford, 451 F.3d at 1356 (internal citations omitted).

In evaluating whether this prong is satisfied, the opinions and views of the vaccinee's treating physicians are entitled to some weight. Andreu, 569 F.3d at 1367; Capizzano, 440 F.3d at 1326 ("[M]edical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" (quoting Althen, 418 F.3d at 1280)). Medical records are generally viewed as trustworthy evidence, since they are created contemporaneously with the treatment of the vaccinee. Cucuras, 993 F.2d at 1528. The petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." Capizzano, 440 F.3d at 1325. Instead, Petitioner may satisfy her burden by presenting circumstantial evidence and reliable medical opinions. Id. at 1325-26.

Since petitioner failed to prove <u>Althen</u> prong one, it follows that she cannot prove <u>Althen</u> prong two.  However, even if Petitioner had proven a sound and reliable causal mechanism, she failed to prove by preponderant evidence a logical sequence of cause and effect, showing that K.H.'s vaccinations caused K.H.'s condition for three reasons: (1) K.H.'s clinical course is not consistent with vaccine-related seizures, epilepsy, and epileptic encephalopathy; (2) K.H.'s clinical course was not consistent with challenge/rechallenge; and (3) K.H.'s treating physicians did not associate his condition with vaccinations.  Thus, the undersigned finds that Petitioner has failed to show by preponderant evidence that the vaccinations administered in April and August 2017 caused K.H.'s encephalopathy, infantile spasms, or IESS by preponderant evidence.

First, regarding K.H.'s clinical course, the undersigned finds there is not preponderant evidence that K.H. had vaccine-induced neuroinflammation.  K.H.'s MRI of the brain did not show findings consistent with inflammation.  As explained by Dr. Zempel, although gadolinium (contrast) was not used, multiple sequences were performed that were sensitive for inflammation, and none showed inflammation.  CSF testing did not reveal elevated protein that would suggest neuroinflammation.  K.H. did not have a fever or febrile-induced seizure to suggest cytokines were elevated.  And K.H.'s physicians did not diagnose an inflammatory condition like encephalitis.

Next, the undersigned finds there is no evidence that K.H. had an autoimmune condition.  Diagnostic testing, including brain MRI and the CSF results were not consistent with such a condition.  K.H.'s physicians did not diagnosis an autoimmune condition.  And they did not order antibody testing indicating that they did not consider an autoimmune condition.  Overall, the undersigned finds Dr. Zempel's and Dr. Platt's opinions that there was no evidence of an immunological response to vaccinations to be more compelling than the arguments by Dr. Shafrir, which were not supported by diagnostic testing, treating physician opinions, or other evidence.  The fact that K.H. was treated with steroids, and had a positive response, is not determinative, for the reasons explained by Dr. Zempel and Dr. Platt.

The undersigned also disagrees that K.H. had encephalopathy caused by his initial set of vaccinations on April 7, 2017 or the second set of vaccinations August 1, 2017.  In reaching this finding, the undersigned relies on the opinions of Dr. Zempel, the medical records, and treating physician opinions.  Dr. Zempel explained that the definition of acute encephalopathy is "a change in the level of consciousness."  Tr. 292.  He opined that K.H.'s symptoms described by Petitioner (e.g., loss of eye contact/tracking) were not consistent with encephalopathy.  Instead, Dr. Zempel opined that the behaviors were likely related to the clinical onset and progression of K.H.'s IESS.  Dr. Zempel's opinion is consistent with the medical records from Johns Hopkins on May 1, 2017, when K.H. was observed with "[l]imited fixing on [] Mom's . . . face."  Pet. Ex. 9 at 34.  K.H.'s neurological examination was normal, although the video taken by Petitioner was "concerning for infantile spasm."  <u>Id.</u>  ER diagnosis was "epileptic syndrome, not intractable, without status epilepticus."  <u>Id.</u> at 37.  K.H. was not diagnosed with encephalopathy.

The undersigned finds that Dr. Shafrir's characterization of K.H. as encephalopathic after his vaccinations is a misunderstanding or mischaracterization of IESS.  As explained by Dr. Zempel, K.H.'s condition is a syndrome characterized by epileptic spasms, cognitive dysfunction, and developmental delay.  K.H.'s clinical presentation was consistent with Dr.

Zempel's description.  For example, the ER records on May 1, confirm that Petitioner reported that K.H. was "not developing at the same rate as twin" but he was "awake, alert, fussy but consolable," and "eating well."  Pet. Ex. 9 at 44.  He was not diagnosed with encephalopathy, but his EEG that day was "concerning for [] hypsarrhythmia," and K.H. was admitted for workup of epilepsy/infantile spasms.  Id. at 48-49.  K.H.'s discharge diagnosis was infantile spasms.  The undersigned finds that the medical records show a clinical course consistent with Dr. Zempel's opinions and not with Dr. Shafrir's focus on encephalopathy.

Second, the undersigned finds that Petitioner did not prove K.H. had a positive challenge/rechallenge by preponderant evidence.  The basis for Dr. Shafrir's challenge/rechallenge opinion is that K.H. had an adverse reaction to his first set of vaccinations which manifested as regression and/or delay of development.  Dr. Shafrir opines that the adverse reaction reoccurred after his second set of vaccinations, described as regression of milestones and delayed development.  Dr. Shafrir agreed K.H. was "still significantly behind developmentally" before receiving his first vaccinations on April 1, but he maintained K.H. was improving and tracking visually, and that his visual tracking regressed after the first set of vaccinations.  Tr. 102-03.  He opined that Dr. McCaul, on August 15, documented K.H. was tracking inconsistently.  See Pet. Ex. 9 at 669 (finding K.H. "only appears to fixate on me briefly, does not track").  Based on this note, Dr. Shafrir opined that K.H. regressed after the second set of vaccinations on August 1.

A more detailed review of the records shows concerns about development were documented at K.H.'s two-month visit on April 7, 2017, relative to K.H.'s head shape and feeding issues.  Decreased eye contact was observed on April 24 and 28, and Petitioner reported that K.H., as compared to his twin brother, did not have the same level of eye contact or engagement with family members.  On May 1, Petitioner reported K.H. was having episodic movements of his limbs and abnormal eye movements.  K.H. was taken to the ED, admitted, and diagnosed with infantile spasms.

After K.H.'s diagnosis with infantile spasms, and evaluation by neurologists, K.H.'s records become more detailed, and contain continued concerns about his developmental delay.  On May 15, Dr. Sims wrote K.H. "fixes on face more, [although] for brief periods."  Pet. Ex. 7 at 61.  At that visit, Petitioner reported that the day before, K.H. watched his older siblings play.  Although Dr. Sims did not document a thorough neurological examination, she opined that K.H. had some improvement, but she referred K.H. to Infant & Toddler services and made a referral "neuro development."  Id. at 62.  At the visit on May 22, Petitioner reported that K.H. possibly had two spasms May 19.  Dr. Sims documented hypotonia on the note from this visit.  On May 31, Petitioner reported that K.H. had "symmetric slow arm raising activity noted sporadically."  Id. at 64.  Assessment included "[d]evelopmental concern," with a noted that K.H. had improving milestones with Infant & Toddler services in place.  Id. at 65.

K.H.'s four-month-old assessment June 5 documented continued developmental concerns.  K.H. was unable to push chest to elbow, did not have good head control, and was not beginning to roll or reach for objects.  Neurological examination documented diffuse hypotonia.  K.H. was placed back on prednisolone for spasms on June 3.  He had a cluster of spasms on June 5.  On June 12, Petitioner reported that K.H. was tracking better and had improving

developmental milestones.  However, K.H. was having respiratory issues and increased work of breathing.  K.H. was seen at the ED that day for evaluation and was diagnosed with "periodic breathing."  Pet. Ex. 7 at 78.  He was diagnosed with upper respiratory infection, with symptoms beginning June 13.  On June 20, Petitioner took K.H. to the hospital for evaluation of K.H.'s worsening respiratory problems.  K.H. was admitted from June 20 until June 27 for "human metapneumovirus bronchiolitis with respiratory distress and apnea/periodic breathing."  Id. at 86.  EEG during admission showed "diffuse cerebral disturbance."  Id. at 87.  At his post-hospitalization follow-up visit June 29, Petitioner reported K.H. had some developmental improvements, that he was sucking his thumb, looking at his mother, smiling, and tracking better.  Neurological examination at the visit noted K.H. was able to "partially track" and that he was cooing.  Id. at 90.

Moving to July, K.H. saw Dr. Sims on July 6.  K.H.'s acute respiratory illness was resolving, and he had been spasm-free for four weeks.  He was receiving tapered doses of prednisone.  Dr. Sims observed that K.H. continued to have an abnormal head shape despite "improved tolerance of tummytime," and a referral was made to STARR cranial center for evaluation and for PT.  Pet. Ex. 7 at 93.

On August 1, K.H. returned for his well-child visit.  His six-month evaluation was abnormal.  K.H. did not engage in visual exploration and was not learning to rotate in a sitting position.  Neurological examination revealed improved tone.  Assessment was that K.H. continued to progress developmentally and that his hypotonia had improved.  He received his second vaccinations at that visit.

K.H. was seen by his neurologist, Dr. McCaul on August 15, for follow-up of his May hospitalization.  Pet. Ex. 9 at 667.  A detailed developmental history was documented at that visit and stated that K.H. tracked inconsistently, was able to sit supported, was not reaching for objects, did not transfer objects from hand to hand, recognized mom but it was not clear whether he recognized other family members, and he babbled and smiled, but not reciprocally.  He was attending Infants and Toddlers weekly.  Neurological and physical examination was significant for "[n]o social smile;" "left gaze preference, only appears to fixate on me briefly, does not track;" "[d]ecreased axial tone [with] significant head-lag and slip-through on vertical suspension;" and "[d]d not bat at objects held in front of him."  Id. at 669.  Dr. McCaul's assessment was "multifocal seizures and infantile spasms," with spasms noted to have resolved.  Id. at 670.  K.H.'s examination again showed "left gaze preference, limited ability to fixate, [and] unclear ability to track."  Id.  Dr. McCaul referred K.H. to the Neurodevelopmental Medicine Program at KKI.

K.H. had a recurrence of his spasms on September 1.  Steroids were administered.  On September 6, K.H.'s development assessment showed that he had not lost milestones.  Petitioner reported that K.H. had vomited a few times, and she was concerned that he had viral gastroenteritis.  Petitioner was next seen by Dr. McCaul on September 12, 2017.  The history of recurrent spasms was noted, along with the restart of prednisolone.  Petitioner reported that K.H. was "doing well" with "no further regression [with] recurrence of [infantile spasms]."  Pet. Ex. 9 at 701.  Petitioner reported K.H. "seems to be fixating and tracking more as time goes by" and he was "[p]erhaps smiling 'a little less' than before, but has also been sick with viral gastroenteritis

over the past [six] days." Id.  Developmental history at that visit documented "[t]racking more consistently (improved from a month ago), sits unsupported but a bit wobbly (improved from a month ago), can sit supported without issue, does not transfer objects from hand to hand," "recognizes mom (unclear if he recognizes other family members), no stranger danger, [and] smiles spontaneously though not reciprocally." Id.  Neurological examination revealed "[n]o social smile;" "no longer with gaze preference, able to fixate and track toy horizontally to his left and his right, though not vertically;" "[d]ecreased axial tone [with] significant head-lag;" "[a]ble to sit unsupported though unstable/wobbly;" and "[d]id not bat at objects held in front of him." Id. at 701-02.  Dr. McCaul's assessment was "multifocal seizures and infantile spasms." Id. at 703.  She noted the "[s]pasms have recurred," examination that day was "reassuring, with improved ability to track, compared to a month ago," and steroids "decreased frequence of spasms but did not fully resolve" spasms so K.H. was to start vigabatrin. Id.

On October 3, 2017, K.H. returned to see Dr. McCaul.  Pet. Ex. 9 at 744.  Developmental history documented that K.H. was "[t]racking more consistently recently (improved from a month ago), sits unsupported but a bit wobbly (improved from a month ago), can sit supported without issue, now transferring objects from hand to hand (new as of today's visit)," "recognizes mom (unclear if he recognizes other family members), no stranger danger, [and] smiles spontaneously but not reciprocally." Id. at 744-45.  K.H. also "[h]as interest in rolling but has not completed yet;" he was "[n]ow noticing both hands [] [and] sucks at both hands per Mom;" he could "bear weight on both feet;" and he was laughing and imitating grunting. Id. at 745.  Neurological examination continued to reveal "[n]o social smile;" "no longer with gaze preference, able to fixate and track toy horizontally;" "[d]ecreased axial tone [with] significant head-lag that [was] improving;" "[a]ble to sit unsupported though unstable/wobbly;" and "[d]id not bat at objects held in front of him." Id.  Assessment noted, "[e]xam[ination] today again reassuring;" K.H. had "[n]o loss of milestones following recurrence[] [and] has actually been gaining some new skills, including transferring of objects from hand to hand, since spasms started." Id. at 747.  Dr. McCaul added that "[g]iven [] spasms continue, will go up on [v]igabatrin dose again today." Id.

K.H's next follow-up visit with Dr. McCaul was on February 6, 2018.  Developmental history stated "[t]racking more consistently recently, sits unsupported but wobbly (no significant improvement since last seen in clinic October 2017), can sit supported without issue, [and] transferring objects from hand to hand, [though] [right] hand appears 'weaker' to family/will drop items handed to that hand" with "[p]refer[ence] to use [left] hand to reach out for toys." Pet. Ex. 9 at 764.  K.H. was seeing PT, OT, vision services, and speech services with developmental teacher.  Examination revealed "[s]miled with tickles;" "no longer with gaze preference, able to fixate on [] face briefly but did not track;" "[d]ecreased axial tone [with] significant head-lag that [was] improving; upper extremity tone normal/symmetric; lower extremity tone decreased/symmetric;" "[a]ble to sit unsupported for a few seconds, but unstable/wobbly;" "[w]obbly on feet when brought to stand;" and "[d]id not reach out for toys held in front of him." Id. at 765.  Dr. McCaul's assessment noted K.H.'s examination that day was "again reassuring," with "[n]o loss of milestones following recurrence[] [and] [he] ha[d] been gaining some new skills." Id. at 766.

56

The undersigned finds that physician documented neurological assessments from April 2017 through February 2018 do not support Dr. Shafrir's opinion that K.H. suffered developmental regression after his first or second set of vaccinations. Concerns about K.H.'s eye contact and interaction with others were documented on April 7, 2017. K.H. was referred to Infant and Toddler services on May 15 due to these concerns. K.H.'s developmental screening assessment in June was abnormal; K.H. was unable to push his chest to elbows, lacked head control, did not roll or reach, and had diffuse hypotonia. In June, he had some development improvements (sucking his thumb). On August 1, he did not engage in visual exploration. The first detailed neurological evaluation documented by a neurologist after his hospital discharge for infantile spasms was on August 15, and K.H. was described as tracking inconsistently, not dissimilar from physician notes on May 15 ("fixes on face more, [although] for brief periods"), June 29 ("partially track[ing]"), and September 12 ("tracking more as time goes by"). Pet. Ex. 7 at 61, 90; Pet. Ex. 9 at 701.

Moreover, the treating physicians did not opine that K.H. regressed as a result of his recurrence of infantile spasms. On September 6, the neurologist opined K.H. had not regressed or lost milestones due to his recurrence of spasms. In February 2018, K.H.'s assessment was again reassuring. K.H. had no loss of his milestones following recurrence of spasms and had been gaining some new skills. K.H. was not diagnosed with regression due to his vaccinations. Thus, the undersigned finds that K. H.'s clinical course does not support a finding of challenge/rechallenge as opined by Dr. Shafrir. Instead, the undersigned finds K.H.'s chronology is consistent with Dr. Zempel's description of infants with IESS who have a recurrence of spasms, especially in the context of steroid taper.

Third, the undersigned gives weight to the statements of the treating physicians as "treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" Capizzano, 440 F.3d at 1326 (quoting Althen, 418 F.3d at 1280); see also Andreu, 569 F.3d at 1367 (explaining opinions and views of the vaccinee's treating physicians are entitled to some weight); Cucuras, 993 F.2d at 1528 (noting contemporaneous medical records, "in general, warrant consideration as trustworthy evidence").

And here, numerous treating physicians opined vaccines did not cause K.H.'s condition. See, e.g., Pet. Ex. 7 at 136-37 (Dr. Sims' stating "there is no proven relationship between vaccines and infantile spasms and there is no contraindication to vaccines"); Pet. Ex. 9 at 171 (Dr. Rios reiterating K.H.'s vaccinations were not related to his infantile spasms); Pet. Ex. 20 at 292 (genetic counselor Ms. Schatz noting "most likely[,] [] [K.H.] has an underlying genetic condition that is the cause of his medical history, and that the vaccines were likely not the cause"); Pet. Ex. 115 at 87 (Petitioner acknowledging providers had told her K.H.'s spasms were not related to his vaccinations).

For all of the reasons described above, the undersigned finds that Petitioner has failed to provide preponderant evidence of a logical sequence of cause and effect required under Althen Prong Two.

### C.    <u>Althen</u> Prong Three

<u>Althen</u> prong three requires Petitioner to establish a "proximate temporal relationship" between the vaccination and the injury alleged.  <u>Althen</u>, 418 F.3d at 1281.  That term has been equated to mean a "medically acceptable temporal relationship."  <u>Id.</u>  Petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disease's etiology, it is medically acceptable to infer causation-in-fact."  <u>de Bazan</u>, 539 F.3d at 1352.  The explanation for what is a medically acceptable time frame must also coincide with the theory of how the relevant vaccine can cause the injury alleged (under <u>Althen</u> Prong One).  <u>Id.</u>; <u>Koehn v. Sec'y of Health & Hum. Servs.</u>, 773 F.3d 1239, 1243 (Fed. Cir. 2014); <u>Shapiro</u>, 101 Fed. Cl. at 542 (2011).

Since Petitioner failed to prove <u>Althen</u> prong one, it follows that she cannot prove <u>Althen</u> prong three.  In addition, there are independent reasons why the undersigned finds Petitioner failed to prove <u>Althen</u> prong three.

On the date that K.H. received his two-month vaccines, April 7, Petitioner expressed concerns about feeding issues, noting that milk leaked from his mouth, he drooled more than his twin, and he had issues with latching.  Dr. Sims observed K.H. feeding and noticed "frothy bubbles."  Pet. Ex. 7 at 47-49.  K.H. had a normal neurological examination.  On April 24, Petitioner reported K.H. seemed to avoid eye contact and he did not engage with the family as much as his twin.  K.H. was next seen by Dr. Sims on April 28, due to abnormal movements.  After viewing a video of K.H.'s movements, Dr. Sims recommended that Petitioner take K.H. to the ER, where an EEG was performed, and K.H. was diagnosed with infantile spasms.

Dr. Shafrir opined that K.H. was clinically encephalopathic when Petitioner reported that he was not tracking.  Based on the medical records, the earliest reference to avoiding eye contact was made by Petitioner on April 24, over two weeks after his initial vaccinations.  Dr. Sims noted a comment about tracking on May 15.

Dr. Zempel disagreed with Dr. Shafrir's approach of splitting K.H.'s illness into two parts, one characterized by encephalopathy and the other by infantile spasms.  He explained that the symptoms described by Petitioner were not a change in responsiveness (encephalopathy) but instead, most likely the onset of his IESS.  Dr. Zempel opined that the "clear expression of the syndrome was [April 30, 2017]," when K.H. had an infantile spasm witnessed by his mother.  Resp. Ex. B at 6.  Dr. Zempel acknowledges the concerns expressed earlier, when Petitioner reported K.H. was not focusing on faces or toys.  Dr. Zempel also notes that there were problems with feeding, suggesting that these problems may be related.

Based on Petitioner's observations about K.H.'s eye contact and Dr. Zempel's opinion tying onset to the initial infantile spasms, the undersigned finds that the range of onset for K.H.'s IESS is April 24 to April 30, 2017.

This time frame is too long to be explained by an innate immune response related to inflammation, as posited by Dr. Shafrir.  He conceded that a cytokine response (innate immune response) would occur within hours of vaccination.  However, there is no evidence that K.H. had

an adverse innate immune response within hours of his vaccination in either April or August 2017.

Dr. Shafrir focused on the time frame for onset between seven and 15 days, and he based this time frame on the NCES, Vaccine Injury Table, and DTaP vaccine package insert. However, he failed to show that K.H. had encephalopathy within 15 days of vaccination. Even if this time frame was appropriate for an adaptive immune response, Dr. Shafrir failed to provide preponderant proof of such a response.

Therefore, the undersigned finds that Petitioner failed to provide preponderant evidence of <u>Althen</u> prong three.

## V.    CONCLUSION

The undersigned extends her deepest sympathy to Petitioner, her family, and to K.H. for the overwhelming issues that they have faced. The undersigned's Decision, however, cannot be decided based upon sympathy, but rather on the evidence and law.

For all of the reasons discussed above, the undersigned finds that Petitioner has not established by preponderant evidence that vaccinations caused K.H.'s condition. Therefore, Petitioner is not entitled to compensation, and her petition must be dismissed. In the absence of a timely filed motion for review pursuant to Vaccine Rule 23, the Clerk of Court **SHALL ENTER JUDGMENT** in accordance with this Decision.

**IT IS SO ORDERED.**

<u>s/Nora Beth Dorsey</u>
Nora Beth Dorsey
Special Master

59